Bonner *vs.* Welborn.

No. 55.—Robert Bonner, plaintiff in error, *vs.* Alfred Welborn, defendant.

[1.] Whether the Act of 1791, requiring license for keeping a tavern or house of entertainment, requires a license to keep a tavern without retailing spirituous liquors. *Quere?*

[2.] *Tavern* or *house of entertainment*, as used in the Act of 1791, held to be synonymous; and that the word *tavern* in that Act, is intended to mean the *common inns* of the Common Law.

[3.] One whose business it is to rent houses, and furnish board, lodging and entertainment for a season, at a watering place, to the visitors who resort there: *Held*, not to be the keeper of a tavern, or house of entertainment, in view of the Act of 1791.

[4.] One who is the owner of medicinal springs, and uses them as a source of revenue, by furnishing houses, board, lodging and entertainment to those who resort to them, is entitled to sue in that character, for damage done him, in the construction of a nuisance by which the public are deterred from visiting his springs, and his profits are thereby reduced.

[5.] Nuisance defined.

[6.] In an action on the case for damages done by a nuisance, it is only necessary for the plaintiff to prove possession of the property injured.

[7.] The alienee of the person who erected the nuisance, is liable for the continuance of the nuisance, but only on request to abate it.

[8.] In an action by the alienee of the person first injured by a nuisance, against the person who first erected it, it is not necessary to aver or prove a request to abate it.

Assumpsit, in Merriwether Superior Court.    Tried before Judge HILL, February Term, 1849.

In 1843, Alfred Welborn erected a mill-dam on his own land, adjoining the property known as the Merriwether Warm Springs, then the property of Seymour R. Bonner.    In 1845, Seymour R. Bonner sold and conveyed this property to the plaintiff in error, Robert Bonner.

Iu 1847, Robert Bonner brought an action against Alfred Welborn, alleging that he had been damaged $20,000.

" For that, whereas your petitioner, before and at the time of the committing of the grievances by the said Welborn, hereinafter mentioned, was and from thence hitherto has been and still is lawfully possessed of a certain tract of land, (describing it) containing six hundred acres, more or less, known as the Warm Springs, in Merriwether County; that upon and issuing out of said premises is a bold spring of warm water, possessing valuable mineral qualities, and celebrated for its cures of very many diseases to which the human family are subject; attached thereto are extensive and commodious baths, together with a large hotel and a number of small buildings, all of which have been erected and fitted up, at great expense, for the accommodation of the crowd of visitors, who, for the last ten years, next before the committing of the grievances hereinafter mentioned, resorted to said springs for both comfort and health; the same, before the committing of said grievances, being remarkable for its pure, healthy and salubrious atmosphere, and the uninterrupted and extraordinary health of its inhabitants and visitors, in consequence of which a great number of persons were induced, annually, to visit the same, and spend the summer and fall months.    Your petitioner, at the time of committing said grievances, pursued, exercised and carried on and had done so a long time previous thereto, the business of furnishing said visitors with houses, boarding, lodging, at-

tention, &c. and for so doing, he received, as a compensation, annually, for several years, to wit: for the space of four years, before the committing of said grievances, the sum of twenty thousand dollars, one half of which was net, and a profit, after paying the expenses of the establishment; thus rendering the possession and enjoyment of the premises of the yearly value of ten thousand dollars. By reason thereof, before and at the time of the committing of said grievances, your petitioner of right, ought to have used and enjoyed, and still of right, ought to have and enjoy the benefit and advantage of said springs, as a popular and fashionable watering place, and the custom and patronage of the visitors thereto, and the profits arising therefrom. Yet, the said Alfred Welborn, well knowing the premises, but contriving, and wrongfully and unjustly intending to injure and prejudice your petitioner in this respect, and wholly deprive him of his said business, and destroy the use, benefit and advantage of said situation, and to deter and prevent visitors from resorting to the same, and thus to hinder and prevent your petitioner from receiving the benefit and advantage of entertaining said visitors, and the use and benefit of the premises so possessed as aforesaid by him in so ample and beneficial a manner as he had done theretofore, and of right ought to have done, and to injure him in his said business, which he had for a long time before, and still doth exercise, and carry on on said premises, which he, your petitioner, was so possessed of, with the appurtenances as aforesaid, and so exercised and carried on his said business thereon as aforesaid, to wit: on the 1st day of November, 1843, and on divers other days and times, between that time and the commencement of this suit, the said Alfred Welborn wrongfully and unjustly erected a mill-dam in a short distance, to wit: within the space of four hundred yards of said springs, hotel and houses, of which your petitioner was possessed as aforesaid; and then and thereby caused the water to cease to flow, but to stagnate and to overflow the banks of the creek, and fill the low land, by which a large quantity of timber was and is destroyed, and in a state of decay, in consequence of which, the atmosphere at and around said premises, springs and houses, before that time so pure and healthy, has become and rendered impure and unhealthy, and said premises exceedingly unhealthy, and wholly and totally unfit for a summer residence, so much so, as to deter and prevent the public, during the last season, to wit: from the

first day of June last (1846) to the first day of last November, from visiting said springs, and remaining there as the guests of your petitioner, as they had heretofore done, and would have done, but for the erection of and keeping up said mill-dam.   And your petitioner, by means and by reason thereof, has been and was prevented, from the first day of June last, to the said first day of November, pursuing, following and carrying on his said business, in so large, extensive and profitable a manner as he might and otherwise would have done; but has been thereby, for and during the time last aforesaid, deprived of the use and enjoyment of his said possessions, and of all the profits, benefits, gains and advantages, which he otherwise might and would have made by carrying on his said business thereon, as aforesaid, to the damage of your petitioner, the aforesaid sum of twenty thousand dollars."

The second count was similar to the first, the petitioner alleging a continuance of the nuisance, and that he exercised "the business of entertaining, boarding and lodging the visitors at said springs."

An amended count was similar in all its allegations, but set out at length the names of the visitors who were deterred by the wrongful act of the defendant, from visiting the springs.   This count farther alleged, that by means thereof, the petitioner and his family were made sick and diseased, and thereby incurred great expense, trouble and bodily pain.

A second amended count was, in all its allegations, similar to the first, except that it alleged the plaintiff to be the *owner* of the premises, and that many of his guests, by reason of the unhealthiness of the springs, left before the season was over; besides, many others, whose names are mentioned, were deterred from coming altogether.

Upon the trial, at February Term, 1849, the testimony of the book-keeper and the books of plaintiff were offered in evidence, as well as the testimony of sundry persons who were in the habit of visiting the springs, for the purpose of showing the amounts of receipts for the year 1845 and those of 1846, and to show that the cause of the large decrease ($11,000) was the sickness and apprehension of sickness arising from the mill-dam and pond of defendant.

The testimony was objected to by defendant, on the ground that the plaintiff had not shown that he had applied for and ob-

tained a license to keep a tavern or public house, as required by the Statutes of Georgia.

The Court sustained the objection and plaintiff excepted.

Plaintiff then offered in evidence the records of the Inferior Court of Merriwether County, to show that license to retail spirituous liquors had been granted him, and that he had complied with all the requisitions of the law, to obtain such retail license.

The Court rejected the evidence, and plaintiff excepted.

Much testimony was introduced to show the commencement and character of the sickness at the springs, and that it was produced by the pond of defendant. A brief of it here is unnecessary. No request by the plaintiff to defendant to abate the nuisance was proven.

The Court charged the Jury, that the erection of the mill-pond by defendant, on his own land, being a lawful act, it was necessary that the plaintiff should request the defendant to abate it, or give notice to that effect, before he could maintain this action; and the mill-dam, as shown by the proof, having been erected before the plaintiff purchased the land, or went into possession of the springs, he could not maintain this action for its erection or continuance, until he had requested the defendant to take it down.

To all of which charge, defendant excepted, and upon these several exceptions, error was assigned.

W. Dougherty, for plaintiff in error, cited—

3 *Bac. Abr.* "*Inns.*" 5 *Ohio,* 324. 5 *Modern,* 427. 12 *Modern,* 254.

*Penruddock's case, Coke's Rep.* 176. 10 *Mass.* 77. *Willes' Rep.* 583. 33 *Eng. Com. Law Rep.* 315.

O. Warner, for defendant, cited—

8 *Term,* 303. 2 *Leigh, N. S.* 1395. 7 *Eng. Com. Law,* 121. 1 *Bos. & Pul.* 264. 1 *Maule & Sel.* 593. *Carthew,* 252. 17 *Mass. Rep.* 258. 18 *Eng. C. L.* 304. 6 *Hill, N. Y.* 524. 2 *Greenleaf's Ev.* 385. 1 *Stewart,* 133.

The Court, not being unanimous, delivered their opinions *seriatim.*

. *By the Court.*—Nisbet, J. delivering the opinion.

The first assignment charges error in the decision of the presi-

Bonner *vs.* Welborn.

ding Judge, in ruling out the testimony which went to show the receipts and profits of the *Warm Springs* establishment, in 1845, and in 1846, and the reasons for the difference in the amount of receipts for these two years; and in ruling out the testimony of certain witnesses, going to show that they, (the witnesses,) were deterred from visiting, and kept away from the Springs, by the sickness there in 1846, and on account of a mill pond erected by the defendant in error.

The decision was based upon the assumption, that the plaintiff brings his suit, in character of keeper of a *tavern*, or *house of entertainment*. Suing in that character, the Court held that the evidence was inadmissible, to show damages, until he had first shown compliance with the Act of 1791, in taking out a license to keep a *tavern*, or *house of entertainment*. The proposition with which the defendant starts, is not controverted, to-wit: that he who sues for damages done to him in a particular business, possession or calling, must, before he can recover, prove that he is lawfully entitled to exercise it. I admit that the Act of 1791 requires that license shall be taken out, and bond and security given, before one can exercise the business of keeping a *tavern*, or *house of entertainment*, lawfully. If the plaintiff is the keeper of a *tavern*, or *house of entertainment*, in the contemplation of the Statute, and sues in that character, for damage done to that calling, then, the testimony was properly rejected, because, although he had a license to retail liquors, he had no license, it is conceded, to keep a *tavern*. Without a license, I admit, an action cannot be maintained, for damages done to the calling of a *tavern-keeper*, in the meaning of the Statute. Thus, it becomes of the most vital importance, in this discussion, to determine in what character the plaintiff sues, and what rights are claimed as having been violated. This is to be settled, *alone*, by reference to the declaration. Therein, and no where else, is to be found the grounds of his complaint —the right in which he sues—the character which he bears. I assume, and will undertake to show, that the plaintiff has not brought this action for damages which he has sustained in his business, as *tavern-keeper*, or *keeper of a house of entertainment*. Let us, then, advert to the first and main count in the declaration.

The declaration states that the plaintiff is lawfully possessed of several lots of land, in one body, amounting to about six hundred acres, lying in the County of Merriwether, known as the *Warm*

*Springs;* that upon, and issuing out of these premises, is a bold spring of warm water, possessing valuable mineral qualities, and celebrated for its cure of very many diseases to which the human family are subject; attached thereto are extensive and commodious baths, together with a large hotel, and a number of small buildings; all of which have been erected and fitted up at great expense, for the accommodation of the crowds of visitors who, for the last ten years, have resorted to said springs, for both comfort and health; the same being, before the grievances mentioned, remarkable for its pure, healthy and salubrious atmosphere, and the uninterrupted and extraordinary health of its inhabitants and visitors; and in consequence of which, a great number of persons were induced, annually, to visit the same, and spend the summer and fall months. · The declaration proceeds to state, that at the time of committing the grievances complained of, the plaintiff pursued, exercised and carried on, and had done so, a long time previous thereto, the business of furnishing said visitors with houses, boarding, lodging and attention, &c.; and for so doing, received, as a compensation, annually, for several years, to-wit: for the space of four years, the sum of twenty thousand dollars, one half of which was net profit. By reason whereof, he, of right, ought to have used and enjoyed, and still, of right, ought to have and enjoy, the benefit and advantage of said springs, as a popular and fashionable watering place, and the custom and patronage of the visitors thereto, and the profits arising therefrom. The declaration then proceeds to charge, that the defendant, well knowing, &c. but contriving, &c. to injure and prejudice the plaintiff, and wholly to deprive him of the profits of said business, and destroy the use and benefit of said situation, and to deter and prevent visitors from resorting to the same; and thus to hinder and prevent the plaintiff from enjoying the benefits and advantages of entertaining said visitors, and the use and benefit of the premises so possessed by him, in so ample and beneficial a manner as he had done theretofore; and to injure him in his said business, which he had a long time before, and still doth exercise and carry on on said premises, which he was so possessed of, with the appurtenances aforesaid, did, on the first day of November, 1843, &c. &c. wrongfully and unjustly erect a mill-dam, within four hundred yards of said springs, hotel and houses, and then and thereby caused the water to cease to flow, and to stagnate and over-

flow the banks of the creek, and to fill the low-lands, by which a large quantity of timber was destroyed, and in a state of decay; in consequence of which, the atmosphere at and around said premises, springs and houses, before that time so pure and healthy, has become, and is rendered impure and unhealthy, and said premises exceedingly unhealthy, and wholly unfit for a summer residence ; so much so, as to deter and prevent the public, during the last season, to-wit, &c. from visiting said springs, and remaining there as the guests of the plaintiff, &c. The declaration farther states, that by reason thereof, the plaintiff has been prevented from carrying on his said business, so profitably as he would have done, but has been deprived of the use and enjoyment of his said possessions, and of all the profit, benefit and advantages and gains which he otherwise might and would have made, by carrying on his said business, &c. to the damage, &c. &c. Wherefore, &c.

In another count, the same cause of action, in the same way, is set out, with minuter specifications. There is, also, a count for damage done to the health of the plaintiff and his family, and for costs of medical attendance, &c.

[1.] The lowest view which I can take of this action, is an action for damages done to the plaintiff, by the nuisance erected by the defendant, *in his business.* That business is the furnishing board, lodging and attention, and houses, to such persons as, during the summer and fall months, might resort to the Warm springs, for pleasure, or for the use of the waters for their medicinal qualities. Owning the premises, and having prepared the necessary means, to-wit : houses, a hotel, baths, &c. he was engaged in the business of renting his houses, and boarding, and lodging, and entertaining, *for a season*, that is, for the fall and summer months, such persons as might resort to the springs. Such is described to be his vocation. Now, conceding that this is the character in which the plaintiff sues, is he the keeper of a *tavern*, or *house of entertainment*, within the meaning of those terms in the Statute ? The Statute of 1791 enacts, that any person or persons wishing to keep a *tavern*, or *house of entertainment*, may petition the *Justices of the Inferior Court*, who are empowered, after considering certain things, to issue to such persons, a license for a year, which may be renewed, provided the petitioners shall give bond and security for keeping an orderly house, with good

and sufficient accommodations for travellers, their horses and attendants.

The Act farther makes it the duty of the *Justices of the Inferior Court,* annually, to establish the rates to be paid at *taverns,* which rates the *tavern-keeper* shall *put up* in the *public entertaining room,* and there keep for the year ; and a penalty is prescribed for overcharging. Such are, in substance, the provisions of the Act of 1791 ; an Act which has grown into disuse, except so far as a license to retail liquors is concerned. It is still, however, on the Statute book, and is a law of the land.

I doubt whether the words, *or house of entertainment,* in this Act, were intended to enlarge its application, so as to make it to include another class of subjects, different from those included in the word *tavern.* They appear, rather, to be only a different form of expressing what is meant by *tavern.*

[2.] *Tavern,* or *house of entertainment,* is an alternative form of expression, not unfrequently used, with a view to greater perspicuity. As if it were expressed thus : tavern, or *in other words,* house of entertainment. I do not put forth this verbal criticism as of much value. I am well satisfied, that in the legal significance of these words, in this Act, a tavern is a house of entertainment, and a house of entertainment is a tavern. *See Wortham vs. Commonwealth,* 5 *Rand.* 669. *Also, Sinkores vs. Comm'th,* 9 *Leigh,* 608. *Also,* 3 *Hill's N. Y. R.* 150. *Also,* 1 *Cheves' L. & Eq. R.* 220. That they mean the same thing, is indicated in this : that in no other part of the Act than the first clause, are the words, or house of entertainment, used. On the contrary, in subsequent clauses, they are dropped, and the words tavern and tavern-keeper, only are found. I do not believe that this Act was intended to apply to retail shops alone. But there is reason to believe that it was not intended to apply to taverns, where liquors are not retailed, and that its provisions are directed against the exercise of the business of tavern-keeping, in connection with the vending of ardent spirits, without license and bonds. Public opinion has put this construction upon the Act ; for tavern licenses, except to retail, are very rarely, if ever, asked or exacted.

Taverns, in it, the Act of 1791, are, in my judgment, intended to mean, the *common inns* of the Common Law. What they are, we shall inquire hereafter. The keeping of inns, is not, at Common Law, a *franchise,* but a *lawful trade*—a trade that appertains

to all men, under such restrictions as are imposed by law.  *Bacon's Ab. tit. Inns and Innkeepers, A.*  2 *Roll's Ab.* 84;  *Buls.* 109.  *Salk.* 45.  No license from the King was necessary at Common Law, to keep an inn.  *Ib.*  But ale houses are subject to statutory regulation, and a license is necessary to enable one to keep an ale house.  Now, it is agreed that the Statutes relating to the licensing of ale houses in England, do not extend, generally, to inns; yet, have been held to extend to them, when they degenerate to ale houses, by suffering disorderly tippling.  *Bac. Ab. title Inn and Innkeepers, letter A.*  4 *Mod.* 34.  *Carth.* 151, 263.  *Skin.* 91.  2 *Ld. Ray.* 1303.  Now, it may be questioned whether the Legislature of 1791 intended to restrict the right of the citizen to follow the trade of an innkeeper, as it stood at Common Law.  But, it is probable that they intended only to guard inns from abuse, by requiring a license to retail, and to subject innkeepers to the penalties prescribed, when they degenerated into retailers, without a license.

In the case of the *Overseers of the Poor of Crown Point, vs. Warner,* (3 *Hill's N. Y. R.* 150,) this very question was decided by the Supreme Court of New York, upon a construction of the Statute of that State.  The Statute of that State requires license to issue to tavern-keepers, &c.  In that case, it was determined, that the right to keep an inn, in the Common Law sense of that term, is not a franchise; and hence, notwithstanding the Statute, any person may keep such a house, without a license; but if he wish the privilege of selling strong and spirituous liquors, he must obtain a license; for in such case, the employment is turned into a franchise, by Statute.  In the same case, it was held, that the words inn and tavern, innkeeper and tavern-keeper, as used in the Statute, are synonymous.

In the case of the *State vs. Chambless,* (1 *Cheves' L. & Eq. R.* 220,) the Court of Appeals of South Carolina, placed the same construction upon the Statutes of that State.  By the last Act of that State, the Commissioners of Roads are required to hear all applications for licenses to keep taverns, and to retail spirituous liquors, and are authorized to grant or reject such applications, as to them might seem proper.  By the same Act, both retailers and tavern-keepers are required to give bond, &c.  After reviewing the whole of the legislation upon this subject, the Court, through

*Evans, J.* say : " From what has been already said, we may fairly infer,

1st. That to keep a house for the entertainment of travellers or boarders, requires no license.

2d. That if to such entertainment be added the vending of spirits, in small quantities, as is usually done at the bar of a tavern, then a license is necessary," &c.

It is difficult, if not impossible, to evade the conclusiveness of the authority of these decisions, upon the construction of Statutes analogous to our own.

If then, this be a fair construction of the Act, and the plaintiff here, is admitted to be an innkeeper, or tavern-keeper, in the language of the Act, he has done all that the law requires, in getting, as he did get, a license to retail. I do not rest my judgment, in this case, upon these views of this Act alone.

[3.] I concede, I apprehend, all that could be asked, when I admit that tavern, or house of entertainment, in the Act of 1791, embraces all who are innkeepers by the Common Law. Innkeepers and tavern-keepers are synonymous.  See 1 *Cheves' L. & Eq. R.* 220. 3 *Hill's N. Y. R.* 150. 1 *Hawk. P. C.* 714, *ed. of* 1834. 5 *Rand.* 669. 9 *Leigh,* 608. My position then, is, that the plaintiff in this action, as the declaration describes him, is not an innkeeper at Common Law, and therefore, not a tavern-keeper, under the Act ; and if so, he is subject to no disability, by reason of his non-compliance with its provisions.

An inn is defined by Dr. *Webster* to be " a house for the lodging and entertainment of travellers." It is worthy of note, that in all the definitions of tavern, the idea of retailing liquors is involved, fortifying the construction which I put upon the Act of 1791, as being applicable to retail taverns alone. Thus, *Webster* defines it : " A house licensed to sell liquors in small quantities, to be drunk on the spot."

Common Inns are instituted for travellers. The word in latin, which expresses the meaning of an inn, is *diversorium,* because, he who lodgeth there is *quasi divertius se a via.*  See *Cayle's Case,* 8 *Reports.*

*Lord Bacon* defines an innkeeper to be " A person who makes it his business to entertain travellers and passengers, and to provide lodging and necessaries for them and their horses and attendants." *Bac. Ab. title Inn and Inkeepers, B.*

Bonner *vs.* Welborn.

In *Thompson vs. Lacy*, (3 *B. & A.* 283,) *Bayley, J.* defines an inn thus : " I take the true definition of an inn to be, a house where the traveller is furnished with every thing which he has occasion for, whilst on his way."

" It (an inn) must be a house kept open, publicly, for the lodging and entertainment of travellers in general, for a reasonable compensation." *Ch. Kent's Com.* 2 *vol.* 595. It is not necessary to multiply authorities, to show who is an innkeeper. The leading ideas which pervade them all, are, that inns are houses for the entertainment of travellers—wayfarers—as they are called in *Cayle's* case. For the entertainment of all travellers, at all times and seasons, who may properly apply, and behave with decency ; and that as guests for a brief period, and not as lodgers or boarders, by contract, for a season.

It is because inns and innkeepers have to do with the travelling public—strangers—and that for brief periods, and under circumstances which render it impossible for each customer to contract for the terms of his entertainment, that the law has taken them so strictly in charge. And it is because of the compulsion innkeepers are under, to afford entertainment to any body, that the law has clothed them with extraordinary privileges. Now, under this, (it is submitted,) correct legal view of innkeepers, was the plaintiff in this case, an innkeeper ? Was that his business? His business was, to rent his houses to families or persons who might contract with him for their occupancy. They are not his guests ; they are beyond dispute, his tenants, and he their landlord. His business was, to furnish board, lodging and attention. But to whom? To the wayfaring world ? No. But to persons who might resort to his healthful fountains and salubrious locality, for a season, that is, for the fall and summer months. They were not his guests for a day, or night, or week, but his lodgers or boarders for a season. They were not chargeable according to any tariff of rates, fixed by law, but according to contract, varied, beyond doubt, according to time, amount of accommodation, and other circumstances. These are not the characteristics of the business of innkeeping, but indicate a boarding house. As well might every private boarding house in the State, be adjudged an inn or a tavern, as this party's establishment. The object for which people are stated in the declaration, to have visited the springs, necessarily forbids the idea of their being travellers, and of plaintiff's house be-

ing a tavern. It was health, in the use of the medicinal waters. That object indicates abiding—permanency of location, for a season, at least. These waters cannot cure by seven draughts; or like the waters of Jordan, by seven washings.

The business of the plaintiff cannot be characterized, by inferring outside the record, that the plaintiff was in the habit of entertaining travellers for a day or a night. The question here is, what is his business, as he has described it in his pleadings ? We are shut in to them. By them, his business was not that of an innkeeper. Nothing can be taken against this view of the subject, from the use of the word hotel, in the declaration. That no more indicates the business of tavern-keeping, than would the words mansion or palace, if he had used either of them. It is descriptive of the house, and that is all. Hotel has no definite legal meaning ; it is a derivative from the French language, and means, in France, the dwelling of persons of rank ; it means, in this writ, a house suited to the plaintiff's business.

The distinctions which I have thus taken, are sustained by authority. *Chancellor Kent* says: " If a person lets lodgings only, and upon a previous contract, with every person who comes, and does not afford entertainment for the public at large, indiscriminately, it is not a common inn." 2 *Kent,* 595. 2 *Dev. & Battle,* 424.

The keeper of a mere coffee house, or private boarding, or lodging house, is not an innkeeper, in the sense of the law. *Doe vs. Laming,* 4 *Camp. N. P. R.* 77. *Wathey vs McDougal,* 1 *Bell's Com.* 469.

The case of *Parkhurst vs. Foster,* settles this point, if the authority of the King's Bench can settle any thing. That was an action of trespass against a constable, for quartering a dragoon on the plaintiff, contrary to law. The Statute 4 & 5 *W. & M. c.* 12, authorizes the billeting of soldiers upon inns, livery stables, ale houses, &c. The defendant claimed that the plaintiff was an innkeeper, and therefore, liable to have a soldier billeted upon him. The plaintiff replied, that he was not an innkeeper. The special verdict found the following facts : " The plaintiff kept a house at Epsom, (a watering place,) and let lodgings to such persons as might resort to that place, to drink the waters, and on account of the salubrity of the air ; and that he dressed meat for his lodgers, at 4 pence per joint, and sold them small beer at 2

pence per mug; and also, found them stable room, hay, &c. for horses, at such and such rates."

According to this description of his business, the question was, was he an innkeeper in the legal sense of the word? I shall not stop to point out the resemblance, indeed, almost perfect identity of that case and this. The Court determined that he was not. *Holt, C. J.* said: *the case is so plain that there is no occasion to give reasons*, and accordingly, gave none. *Salkeld*, 388. 5 *Modern*, 427.

The same question, as to who is an innkeeper, was made in precisely the same way, in *Parker vs. Flint.* The special verdict found that there were wholesome wells at Epsom, and that the plaintiff, during the season for drinking the waters, indefinitely *demisit conclaria*, (let lodgings,) to such as went thither to drink the waters, for the air or their pleasures; and did dress victuals for them, and sell them ale and beer, and entertained their horses, at 8 pence *per diem*, but sold no victuals, drink, &c. to any but lodgers. The Court resolved " that the plaintiff's house was not a house within the Statute; for first, it was no inn; for the verdict finds, he let lodgings only, which shows him not compelable to entertain any body, and that none could come there without a previous contract; that he was not bound to sell at reasonable rates, or to protect his guests, but contrary it is, in all of said points, in case of innkeeper," &c. Here too, there are wholesome waters at the Warm Springs; plaintiff lets lodgings, cooks and furnishes victuals to those who come to drink the waters, or breathe the air, or for their pleasures; and also entertains their horses. Here, as there, plaintiff is not an innkeeper. In that case is briefly but clearly marked, the difference between this plaintiff's business, and that of an innkeeper. 12 *Mod.* 254. 1 *Ld. Raymond*, 479. *Bac. Ab. title Inn & Innkeepers, B.* Holt, *C. N. P.* 209. 1 *Starkie*, 249. *Carth.* 417. *Hob.* 245. *Dr. & Stud.* 137, *b.* *Cayle's Case*, 8 *Coke.* 3 *Hill's N. Y. R.* 150. 1 *Cheves' L. & Eq. S. C. R.* 220.

[4.] Upon this point, in this case, I should be satisfied to rest my judgment, upon the grounds now taken. There are, however, grounds, to my mind, higher and safer, and more satisfactory than these; upon which my own convictions rest with entire confidence. I have not thought, from the beginning, that the Statute of 1791, and the doctrine of innkeepers and tavern-keepers, have

any thing legitimately to do with the case. The principle upon which the question depends, is a very common, but a vastly important one. The principle, as it affects the plaintiff, is this: every citizen is entitled to the lawful use and profits of his property, and no man has the right to deprive him of the one or the other. The principle, as it affects the defendant, is this: no man has the right so to use his own property as to prevent the lawful use, and destroy the lawful profits of the property of his neighbor. The whole doctrine is found in the familiar maxim—" *Sic utere tuo, ut non laedas alienum*—enjoy your own property in such manner as not to injure that of another person." 9 *Coke,* 59. The principle is so well understood and established, that it is not necessary to support it by authority. Nor does its application here seem to me to be difficult. It is to my apprehension plain, that the plaintiff has come into Court asking damages for an injury done to him, by a nuisance erected by the defendant, in the lawful use of his lands, springs and appurtenances. By the pleadings, (and it is by the case made in the declaration, that we are to determine what principles apply to it,) the plaintiff is the proprietor of a body of land, out of which spring fountains of very peculiar medicinal qualities, highly sanative, and the source, to him, previous to the erection of the nuisance, of a large income—about ten thousand dollars a year. That a large number of people were in the habit of resorting to these springs, for health or pleasure; that he owns houses for their accommodation—baths, and a hotel, in which he entertained visitors, by boarding and lodging them. His business was, to use his land and springs, in this way, as a source of revenue. And he charges that the defendant, intending and contriving to deprive him of the profits of that business, and to destroy the use and benefits of his situation, and to deter and prevent visitors from resorting to the same, and thus to hinder and prevent him from enjoying the benefit and advantage of entertaining them, and *the use and benefit of the premises so possessed by him,* did erect the nuisance; the effect of which is stated to be, to render the place unhealthy and impure, and unfit for a summer residence, and to deter visitors from resorting or remaining there; by reason of which, (the declaration states,) he has been prevented from profitably carrying on his said business, and *has been deprived of the use and enjoyment of his possessions,* and of all the

profit, benefit and advantage which he otherwise might have made by carrying on his business.

The great source of this man's revenue was the springs. He has as much property in them, as in his lands; and they are as much under the protection of the law, as are lands or minerals; are as much liable to abuse. The plaintiff is as much authorized to make them available, in the way described by him, as he is to make his fields available by culture. They constitute an estate; they are his property, and no man may injure them, or their profits, with impunity. The effect of the mill-dam is stated to be, to deprive him of the use of his possessions; the damage is a loss of the profits he was accustomed to derive from them. He does not claim damage as an innkeeper, but as *a proprietor of peculiarly valuable property, and of costly appliances for its use. That* is the character in which he sues. And is he remediless? If he was, there would then be rights without protection, and wrongs without redress. No such reproach can be cast upon the laws of Georgia.

The Circuit Judge ruled, that the defendant was not liable in this case, but upon request, or notice to abate the nuisance. That decision is also excepted to, and is the only other question made. The plaintiff is the grantee of the property, holding title of Seymour Bonner, who was the owner at the time the mill-dam was built. The defendant, Welborn, erected the mill-dam, and is still the owner. The mill-pond did not prove a nuisance, until after the plaintiff bought and went into possession of the springs. At this bar, it is insisted, that an action for damages does not lie in favor of him who is the foeffee or assignee of the owner, at the time the nuisance was erected, against him who erected it, *without request.* This proposition, I do not think, is sustainable, either upon principle or authority.

[5.] A private nuisance, is any thing done to the hurt or annoyance of the lands, tenements, or hereditaments of another. 3 *Black.* 170. If, for example a person keeps his hogs or other noisome animals so near the house of another, that the stench of them incommodes him, and makes the air unwholesome, this is an injurious nuisance, as it tends to deprive him of the use and benefit of his house. 9 *Coke,* 58. 1 *Burrow,* 337. 3 *Black. Com.* 217. If one does any other act, in itself lawful, which yet being done in that place, necessarily tends to the damage of an-

other's property, it is also a nuisance. So closely, says *Black-stone*, does the law of England enforce that excellent rule of gospel morality, of " doing to others, as we would that they should do unto ourselves." Let this suffice to show what a nuisance is, and that the act complained of in this instance is a nuisance. The obligation of each citizen is, to use his own property in such a way as not to do hurt or damage to the property of another. If he does not, he creates a nuisance, and is liable to respond in damages ; and this, although the use to which he applies his property is, in itself, lawful. The *condition* upon which he uses his property is, that *no one* shall be injured thereby. The rule is of universal application ; no one is exempt from its operation ; nor does the obligation depend upon the time when, or the manner in which, he becomes owner. *Eo instanti* in which the use of his property becomes injurious to another, it is a nuisance, and he is liable in damages. This liability depends upon no other fact or circumstance—if the nuisance exists, if the damage is proven, *the law*, without more, attaches to him the liability. The law devolves upon him the burden of seeing to it, that in the use of his property, he does no injury to his neighbor. There is, therefore, no condition precedent to the recovery of the person injured in his property, or the use of it. The conclusion from these principles, is irresistible, that he who does hurt or damage to another, in the use of his own property, is liable, without notice or request. There is but one exception to this rule, and that is, where the assignee of him who erected the nuisance, is sued. This exception, to my mind, is not altogether consistent with the principles upon which this kind of action is founded. The authorities, however, recognize it, as will appear, and I yield to authority. This case is not within the exception, because the defendant is not assignee, but the original builder of the mill-dam, and now the owner. Farther, this obligation is not limited to one, or a few persons, or to one or any class of property owners. It extends to all, no matter who they are, or where, or in what manner they came possessed of their property. He is allowed to injure *nobody*. In the language of *Eyre, Ch. J.* : " *he is responsible to all the world, on the principle, sic utere tuo ut alienum non laedas.*" *Bush vs. Steinman*, 1 *Bos. & Pull*, 407.

On the other hand, the rights of the persons injured are co-extensive with the obligations of the persons injuring. All who are

injured, are entitled to sue; and the right to sue is complete the moment the injury is done. No preliminary step is necessary. *The law* gives the right as necessarily springing out of the injury. The right to use his own property without hurt or molestation, lawfully, goes with the property—it is incident to it—*the law* attaches it. When this right is violated, the remedy is at once at the control of the party. Formerly, the remedy given for a nuisance was *the writ of assise of nuisance*, and by this not only were damages recoverable, but the nuisance was abated, and it lay originally only against the very wrong doer himself; but by *Stat.* 2, 13 *Edw. I. c.* 24, it lies against the wrong doer, and at the same time against his alienee. Before ·this Statute, the party injured, in case of alienation by the wrong doer, was driven to the writ *quod permittat prosternere.* This writ lay in favor of the alienee of the party first injured, as well as against the alience of the party first injuring, and on this writ, also, the judgment was for damages, and also that the nuisance be abated. In these actions it was necessary that the freehold be in the parties respectively. They, however, are now out of use. 9 *Coke's R.* 55. 2 *Inst.* 405. 5 *Coke's R.* 100, 101. 3 *Black. Com.* 222.

[6.] They have given way to the *action on the case* for damages. This remedy is for damages done to *the possession* by the nuisance. In it the judgment is not to abate. Hence it may be brought by him *who has possession* of the property injured, against him *who is in possession of the nuisance.* No matter who the plaintiff is, whether the party first injured, or his alienee or lessee, if he is in possession, he may sue for the injury done to that possession. His right is perfect—it depends upon no precedent steps. He is required in his declaration only to aver his possession, and he is only required to prove that and his injury. If these things are so, what becomes of the idea that where the alienee of the party injured is plaintiff in a suit against the party first injuring, a request to abate is a necessary preliminary step? It is, as I before conceded, when he sues the alienee of the party first injuring. The idea does not grow out of the *principles* which govern this action, and that I have correctly stated these principles, see the last authorities; also, 2 *Saunders' R.* 113, *a.* 6 *B. & C.* 703. 1 *Chitty's Pl.* 180. *Com. Dig. Pleader,* c. 39. 2 *Saund. Plea. and Evid.* 687.

Whether a request be necessary, except in the single instance

mentioned, may be tested by the pleadings. It is submitted that a form or an authority is not to be found, proving the averment of request necessary, except where the suit is against the alienee of the party first injuring. In that case, the averment must be made. *Willes' R.* 583. 2 *Saund. Plead. and Evid.* 687, 688. The exception proves the rule. Even if a party is not lawfully in possession, he may sue. 1 *East,* 244. 1 *Show.* 7. 7 *Cro. Car.* 325. When the injury is done to the inheritance, a reversioner may sue. *Com. Dig. Action on the Case for Nuisance, b.* Arch. *Plead.* 14. Both the occupant and reversioner may sue. 3 *Lev.* 209. 4 *Burrow,* 2141. *Saund.* 322, *n.* A devisee may sue for the continuance of a nuisance erected in the lifetime of the testator. *Cro. Jac.* 21. Every occupier is liable for *continuing* a nuisance. *Com. Dig. Action on the Case for Nuisance, b.* 1 *B. & P.* 409. *Willes' R.* 583. 2 *Salk.* 460. 2 *B. & P.* 409. When the action is against the alienee of him who first erected the nuisance, it is sufficient to show that the defendant continued it. 5 *Coke's Rep.* 100. 7 *C. & P.* 25.

[7.] As to the exception, that request is necessary where the action is against the alienee of him who first erected the nuisance, I have to say, that it is sustained in the case of *Penruddock,* 5 *Coke,* 100 ; also, in 2 *Greenl. Rep.* 36. I do not question this rule on authority. The alienee is liable, because he *continues* the nuisance; which is the same as a new wrong. Why the request is necessary, even in that case, I do not well see. Perhaps it goes upon the idea, that buying after the cause of the nuisance is erected, he may not know that it is, in fact, a nuisance, and it is but equitable to warn him before he is made liable. The same reason would make it necessary to request the first constructor of the nuisance, in an action by the first person injured. For a long time the cause of the nuisance may not make a nuisance—afterwards the nuisance is developed—he may not know it. Ought not he also to be warned? It would seem so ; but that he ought, there is neither pretence nor authority. But as this case is not within the exception, I say no more about it.

[8.] It is said that, *upon authority,* the alienee of the person first injured, (e. g. this plaintiff,) cannot sustain this action against the person who erects the nuisance, (e. g. this defendant,) without request. The authority relied on is the *dictum* by Greenleaf in his *Evidence,* and by *Selwyn* in his *N. Prius,* and it may be

some other *dicta,* but I now remember no other.   *Greenleaf* says, " So, if the plaintiff has purchased a house, against which a nuisance has been committed, he may maintain this action *for the continuance* of the nuisance, after request to abate it." 2 *Greenlf. Evid.* §472.

This is really but the assertion of the exception already conceded.   The writer says the action may be maintained for *the continuance of the nuisance,* upon request.   The action he speaks of is against the *alienee* of the person who erects the nuisance, for the reason that it is for *the continuance* of the nuisance.   That language in the books is not applicable to the builder of the nuisance, but to his *alienee.*   The *dictum* in *Selwyn* is to the same effect, and refers to suits against the *alienee* of the wrong doer.   But both these elementary writers refer to the *same* case, and to *no other,* for the doctrine laid down in the text, and that is *Penruddock's case,* 5 *Coke,* 100, 101.   So far from that case supporting the position, that in a suit by the *alienee of the person injured,* against the person *who first erected the nuisance,* a request is necessary; it rules *exactly the contrary.*   That case does establish the doctrine, that if the alienee of the person erecting the nuisance, is *sued,* request is necessary, and that is the construction which I have put upon the text of *Greenleaf* and of *Selwyn.*   Certainly, it cannot be said that the text of a compiler is higher authority, than the decided case referred to to support the text.   The text of *Greenleaf* and *Selwyn* is to be viewed in the light of the decision referred to; and viewed in that light, it is no authority against the position I am attempting to sustain.

*Penruddock's* case was this:   The alienee of the person injured, brought the ancient writ *quod permittat prosternere,* against the *alienee* of the person who erected the nuisance.   The first question made was, whether the writ of *quod permittat* "lies in this case *for* the feoffee, or not"—that is, for the plaintiff who was suing as alienee or feoffee.   It was objected, " that when a wrong or injury is done by levying of a nuisance, for which an action lies, that if he who has the freehold, to which the nuisance is done, conveys it over, now this wrong is remediless."   To this objection, it was answered and resolved by the Court, " that the dropping of the water in the time of the feoffee, (the plaintiff) is a new wrong, so that the permission of the wrong by the feoffer, or his feoffee, (the defendant) to continue to the prejudice of another,

should be punished by the feoffee of the house, &c. (that is the plaintiff) and if it be not reformed, *after request made*, the *quod permittat* lies *against the feoffee*, and he shall recover damages, if he do not. reform it; but without request made, it doth not lie against the feoffee, but against him that doth the wrong, (the party who erects the nuisance,) it lieth without any request made, for the law doth not require any request to be made to him who doeth the wrong himself."

This is the judgment of the Court. My Lord *Coke's* report of the case is not encumbered with words; and although the case requires some little study to understand it, no one need misunderstand it. The case rules three things: 1st, that the writ lies *for* the plaintiff, who is an alienee; 2d, it lies *against* an alienee only *on request*, and 3d, it lies against the original constructor of the nuisance *without request*. The three positions are conceded; and the case is an authority for what I wish to establish, to wit: that the action lies in favor of an alienee, against the person who constructs the nuisance *without request;* and that is this case. My research has discovered no case, not one, to the contrary. 5 *Coke's R.* 100, 101. 10 *Mass.* 72. 3 *N. Hamp. R.* 88. 2 *Rawle's R.* 83. 5 *Verm.* 215. 2 *Greenleaf's R.* 36. *Willes' R.* 583.

Let the judgment be reversed.

———

LUMPKIN, J. concurring.

Agreeing as I do with my brother *Nisbet* in his general views and reasoning, I should not deem it necessary to give a separate opinion, were it not made obligatory by the Act organizing this Court, *in cases of dissent.* As it is, I shall endeavor to be brief, though not quite so laconic as was Lord *Holt*, in *Parkhurst vs. Foster*—a case entirely similar to this—where he not only decided, that one who kept a house of entertainment at Epsom or Tunbridge, was not a tavern keeper in the meaning of the Statute, but said, " The case was so plain there was no occasion for giving reasons." 1 *Salk. R.* 387.

This is an action on the case, brought by the plaintiff, to recover damages of the defendant for the injury done to the health of himself and family, to his property and business, in entertaining

visitors at the Warm Springs, in Merriwether County, by the erection of a nuisance by the defendant in the neighborhood.

It is contended on the part of the defendant, that the plaintiff is not entitled to recover out of him, on account of the loss of visitors, because he had no license to keep a public house; and that he is not liable for any part of the injury of which the plaintiff complains, since neither the plaintiff, nor any other person for him, ever requested the defendant to remove the nuisance.

. I would premise, that he who is injured by a nuisance, may enter and abate it; or he may have redress by action. In ancient times, the remedy was a *quod permittat prosternere*, or an *assise* of nuisance. In both these actions the plaintiff had judgment, not only for his damages, but for the abatement of the nuisance also. *Breton's case*, 9 *Coke*, 53.

At Common Law, an *assise* of nuisance was held to lie only against him who erected the nuisance, and not against him to whom the tenement had been transferred; and the reason assigned for this was, that there was not found in the register any form of writ in which it was not supposed that the tenant erected the nuisance. This defect was remedied by Statute of Westminster 2, *Cap.* 24, which made him liable to whom the person erecting the nuisance had conveyed the tenement.

In the reign of Queen Elizabeth, the *quod permittat* and *assise* began to go out of use, and an action on the case to be substituted; but in this action, no judgment can be had to abate the nuisance, but only to recover damages; but as observed by Judge *Blackstone*, the effect will be much the same, unless a man has a very obstinate as well as an ill-natured neighbor, who had rather continue to pay damages than to remove his nuisance. In such a case, recourse must at last be had to the old and sure remedies, which will effectually conquer the defendant's perverseness, by sending the Sheriff with his *posse comitatus*, or power of the County, to level it. In an action on the case for a nuisance, it is not necessary that the freehold should be in the plaintiff and defendant respectively, as it must be in the old real actions; but it is maintainable by one who hath *possession only*, against another who hath like possession. The process is, therefore, easier. 3 *Black. Com.* 222.

1. That persons who keep houses of entertainment at Saratoga and other watering places, *may. be inn-keepers*, I will not under-

take to deny.  Mr. *Bayley*, Justice, in *Thompson vs. Lacy*, (3 *Barn. & Ald.* 287,) defines an inn to be " a house where the traveller is furnished with every thing which he has occasion for whilst on his way."    And Judge *Story*, (*Bailments*, §775,) quotes this definition with approbation.   It is not the *location*, therefore, but the *character* of the house, which determines whether it be an inn or not.

The question to be considered is, whether the proprietor of valuable Mineral Springs, situated in a healthy section of country, and who, in order to the full enjoyment of his property, erects a hotel, with other tenements, for the accommodation of lodgers, who resort there for pleasure or health, is a tavern keeper, in the meaning and intent of the Act of 1791?   We think not, most clearly; for here, the business of entertaining guests is an incident only appurtenant to, and springing out of, the property, and is necessary as a means of enjoying it, and consequently may be pursued without license.   As well might Dr. *Coyle*, the proprietor of the hydropathic establishment at Milledgeville, be deemed and held a tavern keeper, because he has fitted up a large and commodious hotel and other fixtures, for the comfort and cure of the numerous patients who repair there, for the benefit and advantages of the cold-water treatment which the owner administers, and who *lodges* the visitors for the sake of more effectually accomplishing the object of their visit: i. e. the healing of their maladies.

This identical question has been again and again adjudicated in England, in reference to Epsom, Tunbridge Wells, and like places of resort, and the uniform decision has been, that houses of entertainment connected with these places of fashionable resort, were not inns or taverns, in the legal acceptation of these terms. 5 *Mod.* 427, 430.    *Carth.* 417.    *Cro. Jac.* 214, *pl.* 4.   1 *Ld. Raymond*, 479, &c.

But it is said, that the plaintiff in this case has assumed the office and character of an inn-keeper, and sued for special damage, sustained in his business as such.    It is conceded, I understand, upon the authority of the cases cited, that the owners of these Mineral Springs could not be deemed tavern keepers under the Act, but it is argued, that inasmuch as the plaintiff claims to recover in that right, and by virtue of that employment, that he must be judged by his pleadings.

We do not so understand the record.   So far from *declaring* as a common inn-keeper, the pleader seems studiously, throughout, to have avoided that conclusion.   It is true that he states, that attached to these Medicinal Springs, there are "commodious and extensive baths, and a large hotel, and a number of small buildings, which have been erected and fitted up at great expense." But it is all, as it is averred, "for the convenience of the visitors who resorted to this fountain of health." The writ recites, that the plaintiff's net profits were diminished in consequence of this nuisance, $10,000 per annum.   But what was the source of this income?   The declaration informs us, not for furnishing travellers generally "on their way," in the expressive language of the Court of Common Pleas, just quoted, but in supplying "the *visitors at the Warm Springs* with houses, boarding, lodging, attention," &c.

Now, analogize this writ to one of those referred to in the British Reports.   By *Statute 4 and 5 Will. and Mary*, entitled "an Act for carrying on war with France," it is declared "that Constables may quarter soldiers upon *inn-keepers*," &c.  An action was brought against a Constable for quartering a horse and dragoon upon the plaintiff, in which it is alleged that there are wholesome wells at Epsom, and that for the purpose of drinking said waters, the plaintiff let lodgings to such as resorted thither to drink the waters, or for air, or for their pleasure, and did dress victuals for them, and sell them ale and beer, and entertain their horses at eighteen pence per day, &c.   I ask, is not the parallelism in the averments of the two writs perfect ?   And yet the Courts there have constantly held, *that such allegations did not* constitute the plaintiff an inn or tavern keeper, within the description of the Act; and that such a proprietor was neither liable to have soldiers quartered on him, nor compellable to entertain *every body*.   12 *Mod. R.* 255.

Again, test this declaration by the forms prescribed in the works on Pleading, and the distinction is palpable.   When an action is brought by the keeper of a public house, the writ runs thus: "Whereas, your petitioner, before and at the time of committing the grievance hereinafter mentioned, was an inn-keeper, and did keep a common inn for the accommodation of *travellers;* that is to say, a certain common inn, called," &c.   2 *Chit. Plead.* 669.

Bonner *vs.* Welborn.

How different the recitals in the writ before us. Instead of the plaintiff styling himself an *inn-keeper*, and the *keeper of a common inn*, for the *entertainment of all travellers*, he describes himself as the owner and proprietor of a valuable tract of land, containing 600 acres, with the appurtenances thereon, known as the Warm Springs in Merriwether County, upon and issuing out of which is a bold spring of warm water, possessing valuable medicinal qualities, and celebrated for its cure of the many maladies to which the human family are subject, and remarkable for its pure and salubrious atmosphere ; that in consequence thereof, crowds resorted thither to spend the summer and fall months, and that the plaintiff was in the habit of furnishing the said visitors with lodgings, diet, &c.

To state the two forms, is to exhibit their contrast in the most striking manner. The argument, therefore, which would conclude the plaintiff's rights, because he has sued as a common innkeeper, must certainly fail. Nothing can be more foreign from that character than the one in which he has declared. He may well rest content to stand or fall by the record—to be justified or condemned by the account which he has given of his occupation in the action which he has brought.

It is suggested, that the policy of the Act of 1791, extends to taverns at watering places, as well as any where else. If there be any policy in the Statute, our people have been slow in finding it out, and our Inferior Courts very remiss in not enforcing it. The very existence of the Act was known only to a few antiquarians of the profession, and it is a notorious fact, that it has remained almost, if not altogether, a dead letter in the Digest for sixty years. If ever an Act becomes obsolete for non-user, this has. It has been found, I apprehend, by experience, that in this, as in most things else, unrestricted competition is the wiser policy ; that tavern keeping, like every thing else, will regulate itself better than can be done by a tariff of charges, to be imposed by the Inferior Court, and the less legislative interference with, or control over private enterprise, the better for the country.

2. As to the question of notice, the want of which is pleaded in bar to the plaintiff's right to recover *at all*, in this suit, it is to my mind equally free from doubt or difficulty, both upon principle and authority.

It is exceedingly questionable upon principle, whether notice

in any case, ought to be required, in order to bring an action for a nuisance. It is not now, and never was held necessary, to entitle the plaintiff *to have it abated.* Many of the old writers say nothing about *notice,* in treating of the subject. "An action on the case lies for a nuisance to the freehold," says Baron *Comyn,* "though the plaintiff might have an *assise* or *quod permittat.* It lies against him who erects the nuisance, as well as against him who continues a nuisance erected by another; as if A divert water by a pipe and cock to his house, an action lies against his wife after his death, if she live in the house and uses the water, for every turning of the cock is a new nuisance. So, if a man erect a house or *a mill,* to the nuisance of another, every occupier, afterwards, is subject to an action for the nuisance. So, if one recover against A, for the erection of a nuisance, he may afterwards maintain an action against him for the continuance, though he has made a lease of it to another, or may have it against the lessee of it for the continuance, at his election." *Digest, vol.* 1, *tit. Action on the Case for a Nuisance, b.*

Here, it will be observed, there is no allusion whatever to *notice,* in order to entitle plaintiff to his action, either against him who committed the wrong, or the feoffee, for its continuance.

The Statute of Westminster, which made *him* liable to whom the person erecting the nuisance had conveyed the tenement, says nothing about *notice* as a prerequisite or condition precedent to the feoffee's liability. Nor is any *request* averred in the form of the writ, as it is given in *Baton's case,* which was an *assise* against him who erected and him who continued the nuisance, jointly.

In Mr. *Chitty's* precedent for *continuing a nuisance,* there is no *request* averred to abate or remove it. 2 *Chitty on Plead.* 770.

The case of *Beswick vs. Condon,* (*Cro. Eliz.* 402) is the first reported case I can find upon this subject. There the form of the writ is given : " For that the defendant levied a dam in such a river, on such a day, whereby it surrounded the land of J S, who afterwards enfeoffed the plaintiff thereof; and that the defendant *adhuc malitiose custodivit,* the said dam, whereby the plaintiff's land is surrounded."

Here, then, is the exact case before us, in every fact and feature : namely, an action by the feoffee of the land injured, against the person who committed the tort, by erecting the dam in the stream

before he became the purchaser of the property injured.    And
there, as here, there was a demurrer in law interposed ; not for
want of notice, but because the plaintiff had not any interest in the
land at the time the nuisance was erected; and there was not, it
was insisted, any new thing done to his injury.    But the Court
held, that the action was well brought for the continuance of the
nuisance, from such a day to such a day, after the plaintiff pur-
chased.    And *Popham*, Justice, in delivering his opinion, remark-
ed, "If one levies a bank in a river, whereby part of my land is
surrounded, and afterwards I make a feoffment of my land to J
S, and afterwards another part is surrounded by reason of that
bank, he shall have an *assise* of nuisance, *quod ferit concessum* ; so
here, for that the land of the feoffee grew *a malo ad pejus de die in
diem*, by reason of the inundation made by this dam, it is reason
the feoffee should have his action."    *Clench* and *Fenner*, two of
the Court, dissented, on the ground that the *tort* before made was
extinguished by the feoffment; and there was not anything done
since the feoffment, which the feoffee could punish. · But, after-
wards, at a subsequent term, being moved again, all the Justices
agreed that the action was well brought.    It appears from the Re-
porter, that judgment was afterwards given for the defendant in
the case.    But it was upon a new objection : namely, that a man
shall never have an action on the case, where he may have any
other remedy, by writ found in the Register ; for the action on
the case is only given, where there wants such a remedy.    And
here the plaintiff might have his remedy by an *assise* or *quod per-
mittat*.

How forcibly the observation of Justice *Popham* applies to this
case—" that the land of the feoffee grew worse and worse every
day, by reason of the inundation made by the dam, and that *there-
fore*, the feoffee should have his action."    In the case under dis-
cussion, the mischief did not develope itself, until after Robert
Bonner, the plaintiff, became the purchaser of the property.    Then
it was, some two years after the mill-dam was raised, and the tim-
ber on the low-lands overflowed by the pond, having decayed, the
malaria spread desolation and death all around.

If the case then of *Beswick vs. Condon* be law—and I know no rea-
son why it is not—it was argued among others, by *Glanville*, who
was afterwards Speaker of the House of Commons in the reign of
King James, and the author of a volume of Reports, and decided up-

on precedents drawn from the *natura brevium* of *Fitz Herbert*, and the earliest and oldest repositories of the law—I repeat, if this authority has not been overruled, then it would seem to be decisive of the question.    It establishes, conclusively, that in an action on the case for a nuisance, at the instance of the assignee of the property injured against the original wrong doer, that notice is not necessary ; but that the defendant, continuing the *tort*, after the plaintiff's title accrued, and in the use and enjoyment of the dam so erected, with aggravated injury to the plaintiff, is amenable to him in damages.    And if a case can be found, controverting this proposition, it has escaped my notice, after the most careful and diligent investigation.

The case of *Ryppon vs. Bowles*, (*Croke James*, 373,) is the next in chronological order, and it was this :    Thomas Henson erected a building, by which the plaintiff's window was darkened.    Afterwards, Bowles, the defendant, being in possession, the plaintiff brought an action against him for continuing the nuisance.    *Coke*, Chief Justice, inclined to the opinion that the present occupier was not liable.    But all the Court held, *that he who erected the nuisance was liable.*

In *Brent vs. Haddon*, (*Croke, James*, 555,) one Quarles had a mill, and erected a dam, which caused the water to overflow the plaintiff's land.    Quarles leased the mill to Haddon, against whom the plaintiff brought his action for continuing the nuisance, and Haddon, the lessee, was held to be liable.

In *Roxwell vs. Prior*, (2 *Salk.* 460—1 *Ld. Raym.* 713,) it was decided, that where a tenant for years erected a nuisance, for which an action was brought against him, and a recovery had, and he then underlet to another, an action might still be maintained against him who erected it, for the continuance of the nuisance.

An action on the case lies against him who erects a nuisance, and against him who continues a nuisance erected by another.    Thus the occupant, as well as the owner of a thing, erected to the nuisance of another, is liable to an action on the case, which may be brought by the successive owners and occupants of the place where the injury is sustained.    *Bigelow's Dig.* 440.

Up to this period, we find nothing in the books of *notice*, as between *any parties*.    But *Penruddock's* case, (5 *Coke*, 101,) established the doctrine, that where suit is brought against the *feoffee* of the person who erected the nuisance, that a previous request

to abate it, was necessary; and from that time, this distinction seems to have been generally followed, both in England and in this country.

In that case, the suit was at the instance of the *assignee* of the former proprietor, against the *feoffee* of the wrong doer. And the judgment of the Court was, that the distilling of the waters, in the time of the feoffee, was a new wrong, and that the plaintiff was entitled to sue, after request of amendment, but not before. It was further resolved, *that it lay against him who did the wrong, without request.* And although this last resolution was evidently an *obiter dictum* only, nevertheless, it has been followed as the law, ever since.

In *Winsmore vs. Greenbank,* (*Willes' R.* 597,) decided in 1795, the same doctrine is affirmed, and upon the authority of *Penruddock's* case. "As to the distinction," say the Court, "between the beginning and continuance of a nuisance, by building a house that hangs over or damages the dwelling of another, that, against the beginner, an action may be brought, without laying a request to remove the nuisance; but against the continuer, a request is necessary." The Court say: "That many authorities might be quoted, but that the case is certainly so, and the reason of it is obvious."

"In general," says *Mr. Chitty,* "it is necessary to state in the declaration, not only the injury complained of, but also, the motive, that it was *unlawfully* and *maliciously* committed, as that the defendant, having been requested to remove a nuisance erected by another, fraudulently continuing," &c. 1 *Chit. Pl.* 423. And again: "In a declaration for the continuing of a nuisance, it is not necessary to show the time when it was erected. If the action is not brought against the original erector of the nuisance, but against his feoffee, lessee, &c. it may be necessary to allege a special request to the defendant, to remove the nuisance." 2 *Chit. Pl.* 770, *note h.*

The position occupied on the other side is, that not only in an action between the assignee of the former proprietor, and the feoffee of the erector of the nuisance, that notice is necessary, but that it is also incumbent to allege and prove notice, where the assignee of the former proprietor sues the wrong-doer himself. And it is gravely insisted, that a vital principle of the law is involved in this point; and it may be so, but one thing is quite ev-

ident, and that is, that the case in *Coke* furnishes no pretext for this proposition. The opinion put forth there is, " *That the action is good against him who did the wrong, without request.*" To say that this is *only* true, when brought by the original proprietor, is an interpolation not warranted by the report, nor sustained by any subsequent adjudication.

It is true, that *Prof. Greenleaf*, in his *Treatise on Evidence*, says : " If the plaintiff has purchased a house, against which a nuisance has been committed, he may sustain this action for the continuance of the nuisance, after request to abate it." 2 *Greenlf. Ev.* §472. And *Penruddock's* case, and that in *Willes' R.* are referred to, in support of the text. Now, if the writer intended to say, that the purchaser might maintain an action against the feoffee of him who erected the nuisance, upon request to abate, as he probably did, he is supported by the precedents which he cites. I feel justified in putting this construction upon the *dictum*, because the writer speaks of the *continuance* of the nuisance, a term rarely, if ever, applied to him who *erected* it. If, however, he is to be understood as it is argued he shall be, by counsel for the defendant in error, all I have to say is, that so far from being sustained by his references, they expressly contradict him, and inculcate directly the opposite conclusion ; and the same remark applies to the *dictum* in *Wheaton's Selwyn*, 856.

*Mr. Saunders* understood the principle as all the Courts have held it, where the question has arisen. He says : " It is not necessary that the nuisance be first occasioned by the defendant ; he will be equally liable, if he permit it to continue ; though, where he is not original promoter of the nuisance, a notice must have been served upon him to remove it. The plaintiff, however, may elect to sue the party originally occasioning the nuisance, or his alience." And he, too, quotes *Penruddock's* case. *Saund. Pl. & Ev.* 1, 690.

Here, again, it will be seen how broadly the distinction is kept up, everywhere, between a suit against the *original promoter* of the nuisance and his *alienee;* everywhere maintaining that, as against the *former* suit may be brought, without designating by whom, whether the original proprietor of the property injured, or his assignee, *without notice ;* whereas, a request must be made of the *feoffee*, before the action is commenced. And if ever there was a case where this distinction should not be overlooked, it is

this. For here, the injury resulting from the construction of the dam, was not even developed, until after the plaintiff's title accrued. Had the original erector of the dam, discontinued its use, before Robert Bonner purchased, it might have been a question, whether any offence had been committed by Welborn against him. But this is not the proof. The defendant continued in the occupancy of the mills, during the years 1845 and 1846, when the work of destruction was at its worst. In the case in *Dyer,* 319, the adverse counsel admitted, that Lady Brown, who succeeded to the possession of the premises, upon the death of her husband, was liable—" Because every turning of the cock, by which the water was diverted, was a new nuisance." This action, therefore, is not for a nuisance committed before *Bonner's* time, but for a *tort* done to him.

Were it otherwise; were it for a wrong done long before the conveyance was made to the present plaintiff; the Courts have gone great length to maintain such a proceeding. In *Alexander vs. Kerr,* (2 *Rawle's R.* 83,) the Supreme Court of Pennsylvania held—

1st. That an action on the case lies for damage done to land, however small, caused by a mill-dam; and,

2dly. That such action may be brought by a grantee of the land, at any time within 20 years after the erection of the dam, though his previous grantors and grantees had made no complaint, or some of them may have considered the dam a benefit.

In *Pierson vs. Glean,* (2 *Green's N. J. R.* 36,) an action of trespass on the case was brought by the plaintiff, against the defendant, *for continuing* a nuisance. To the declaration, the defendant pleaded, among other things, that he never erected, or unlawfully maintained, the alleged nuisance; that prior to the 26th of July, 1830, he had no title to, or possession of the dam complained of; that on that day, he became seized and possessed, since which time he had never been requested to reform or remove said dam. To this plea, there was a general demurrer and joinder.

"The law," says the Court, "settled in *Penruddock's* case, has never been seriously questioned since. In that case, it was resolved, that though the continuance of the nuisance by the *feoffee* was a new wrong, yet, a *quod permittat* would not lie against him, without a request made. And that, as well upon the good sense

Bonner *vs.* Welborn.

and common justice of the case, as upon the ground of venerable and unquestioned authority, the demurrer ought to be overruled.

Thus, it is manifest, that whenever and wherever the doctrine has been discussed, the principle in *Penruddock's* case has been constantly cited, and always adhered to, without variableness or shadow of turning ; which is, that in an action for a *continuance* of the nuisance, against the feoffee of the wrong-doer, whether at the instance of the original proprietor of the property injured, or his assignee, *request must first be made* ; but that as against him that committed the wrong, the original erector or promoter of the nuisance, no notice is necessary, no matter who sues. And, as was rightly said in *Winsmore vs. Greenbank*, " The law is certainly so, and the reason is obvious." And hence, we conclude, that the present action is properly brought against Welborn, who erected the nuisance, and who continued to keep it up, without notice. And we should have regretted deeply to have found the law otherwise, seeing the destruction this mill-dam has occasioned, causing a sacrifice of $10,000 a year, for two years successively, to the proprietor of the Springs' property. Had the law been different, it would have been, to my mind, a serious imputation upon the science.

So jealous and guarded have been the Courts, relative to this matter, that they have steadily ruled, that a person never can, by prescription or otherwise, acquire a right to maintain a nuisance.

Said *Sutherland, J.* in <u>Mills vs. Hall</u>, (9 *Wend.* 315,) " Admitting that the defendant's dam has been erected and maintained, more than 20 years, and that during the whole of that period, it has rendered the adjacent country unhealthy, such length of time can be no defence, either to a proceeding on the part of the public, to abate it, or to an action by an individual, for the special and peculiar injury which he may have suffered from it."

The fact seems to be entirely overlooked, in this discussion, that the *continuance, and every use of that which is in its erection and use, a nuisance,* is a new nuisance, for which the party injured has a remedy for his damages. *Staple vs. Spring et al.* 10 *Mass. R.* 72. And yet, it is denied that Mr. Welborn, who originally erected the nuisance, and who continued and used it for two years and more, after the present plaintiff's title accrued, is guilty of any offence against him.

And, say the Court in *Plummer vs. Harper*, (3 *N. H. R.* 88,)

"Upon an examination of all the cases, it will be found, that although in lapse of time, the form of action has entirely changed; yet, the books indicate no change in the liability of the wrong doers. *No case is to be found, in which it has been doubted, that he who erects a nuisance, continues liable as long as the nuisance continues.* But it has often been made a question, how far, and under what circumstances, he who adopted the acts of the original wrong doer, shall be liable." "And it would be difficult to find a good reason why the original wrong doer should be discharged, even by conveying away the land." "The injury *has no connection with the ownership of the land.* He who erects the nuisance, does not transfer the liability to his grantee, by transferring the land; for it is agreed in all the books, that the grantee is not liable, until, upon request, he refuses to remove the nuisance. It does not make the original act less injurious, because the grantee adopts it. And we are not aware that in any action against an individual for a *tort*, it can be a good defence, to show that a third person has assented to the wrong, and thus become liable."

Thus, it is found that the person originally erecting the nuisance, is not only liable to the then proprietor of adjoining lands, injured by it, but to his grantees, at any distance of time; and liable so long as the nuisance continues, notwithstanding he has conveyed away the tenement, and although his feoffee may, by refusing to remove the nuisance, upon request, have made himself likewise personally responsible.

I have not deemed it necessary to advert to the case of *Coglin vs. McLemore*, (1 *Stewart's R.* 133,) in which the Supreme Court of Alabama held, that the vendee of land, after special request to remove a nuisance which had been erected before he purchased, may maintain an action for continuing it.

The facts there, show that notice to remove the nuisance, was actually given. The question, therefore, as to its necessity, was not debated. The opinion is right, and we cordially concur in it. Nay, more—we would adopt the *dictum* of *Mr. Chitty*, and say, that "In some cases, it was necessary, and in all cases, it is judicious, prior to the commencement of the action, to require the defendant to abate the nuisance." 1 *Chit. Pl.* 102. I would only add, that no authority is cited in the case in Alabama. The Reporter, in a note, refers to the *dictum* in *Selwyn's N. P.* and the

Bonner *vs.* Welborn.

references, which are *Penruddock's* case, and the decision in *Willes*, on which we have already commented.

3. Finally, it is contended, that the testimony of McDougald and others, that they declined visiting the Warm Springs, on account of their apprehension of sickness, caused by defendant's mill-pond, was properly rejected, *as too remote to be given in evidence*, as proof of consequential damages produced by this nuisance.

I confess I can hardly comprehend this objection. It is almost too attenuated to be grasped by the mind.

If there be any distinction between *direct and consequential* damages, at this day, it is this : where a nuisance is public, or common to all the citizens, no one can assign his proportion of it, unless the injury be particular and direct. But this is a *private nuisance*. The injury laid in the declaration, is a special injury ; and Bonner, who sues, has suffered a damage not common to all others. His cause of action is therefore well laid, and the proof proffered was admissible to support it.

The case of *Iveson vs. Moore*, (*Ld. Raym.* 486, *and* 12 *Mod.* 263,) was for damage sustained by the plaintiff, in having the passage of his colliery obstructed by the defendant, who was owner of another colliery, *by which the benefits and profits* of the plaintiff's colliery were lessened. This, it appears to me, is very much like the case before us, and must have been made out, necessarily, by just such evidence as the plaintiff here proposed to introduce. The judgment in this case was for the plaintiff, Holt's opinion to the contrary, being reversed by all the Judges of the Common Pleas, and the Barons of the Exchequer.

In *Hart vs. Basset*, (33 *Car.* 2. *Sir S. Jones*, 156,) an action was supported by a person entitled to receive tithes, who, in consequence of an obstruction in the highway, was forced to carry his tithes by a circuitous route. The writ alleged, that he was forced to carry them by a longer and more difficult way, and no other damage was shown.

In *Chichester vs. Lethbridge*, (11 *Geo.* 2, *Willes*, 71,) the last adjudged case in England, prior to the revolution on the subject, the plaintiff averred, that at divers times, between two certain days, he was travelling in his coach in a certain highway, but the defendant obstructed the said highway, by bars, posts, benches, &c. and in his proper person withstood the plaintiff from removing and abating the obstruction ; *so that the plaintiff, then and*

*hitherto, could not and cannot have or use the said highway as he ought,* to his damage forty pounds. The Court were of the opinion, that the damage was sufficiently direct and special to support the action.

The case of *Rose vs. Mills,* (4 *Maule & Selwyn,* 101,) was the obstruction of a navigable stream, so that the plaintiff could not pass with his boat and goods. This was held to be direct or special damage, but surely not more so than the case in this writ.

The only American case that I shall refer to, is *Hughes vs. Hiser,* (1 *Binney,* 463,) which was the obstruction of a stream by a dam, which prevented the plaintiff from floating a raft of timber to market, and the judgment was for the plaintiff. The Court below held, or seemed to think, that if Hughes had declared that the injury arose from owning a valuable lot of timber above the dam, which he intended to raft to market, but did not, in consequence of the erection of the dam, that he could not have recovered, as the injury would have been too remote, and in *contemplation* only. But the Court held, that to support an action on the case, even for a common nuisance, that it was not necessary that the damage sustained should have been *direct;* it was enough if it was *consequential.*

For ourselves, we repudiate such nice distinctions, and hold that an injury that reduces the profits of our estate $20,000 in two years, and reduces its market value to almost a nominal price, is present and palpable, and that the testimony tendered was competent to establish the truth of the declaration.

———

WARNER, J. dissenting.

In the view which I take of the questions presented by the record in this case, I must dissent from the judgment which a majority of the Court feel it to be their duty to pronounce. My objections to the reversal of the judgment of the Court below, are based upon what I consider to be the *fundamental principles* of the law, sustained and sanctioned, as I hope to show, by authority.

" This is an action on the case, instituted by the plaintiff, to recover damages from the defendant, (and I now quote from the brief furnished the Court by the counsel for plaintiff in error,)

Bonner *vs.* Welborn.

for an injury done to his health, to his property, and to the *business of entertaining* visitors at the Warm Springs, in Merriwether County." The plaintiff in the Court below rightly conceived the nature and object of the action, and, to my mind, it is difficult to read the various counts in the declaration without understanding the nature and object of the suit. First, the plaintiff claims *general* damages for an injury done to his health, and that of his family. Second, he claims *general* damages for an injury done to his property; and third, he claims *special* damages for an injury done to his *business*, as the keeper of a hotel or house of entertainment, at the Warm Springs. On the trial, the Court admitted the testimony offered to show the injury done to the *health* of the plaintiff and his family; and also admitted the testimony going to show the *general* damage done to his property; but so much of the testimony of the plaintiff as went to show the *special* damage which he had sustained, as the keeper of a hotel or house of entertainment, was rejected by the Court, on the ground that the plaintiff had failed to show any license under the Statute of this State, authorizing him to keep a tavern or house of entertainment; that keeping a public house of entertainment, without license, was in violation of the law; that by law, he could not require his customers to pay him, and, therefore, he could not have been *injured*, in legal contemplation, by the act of the defendant. in depriving him of that which the law would not give him. The Act of 1791 declares, that " from and after the passing of this Act, *any person or persons* wishing to keep a tavern, or *house of entertainment*, shall petition the Justices of the Inferior Court held for the County where such petitioner resides; and the Court to whom such petition shall be exhibited, shall thereupon consider the convenience of such place, intended for a tavern, and having regard to the *ability* of such petitioner to keep good and sufficient accommodations for travellers, their horses, and attendants, may, at their discretion, grant a *license* to such person or persons, for the term of one year next ensuing the date of such license, and from thence to the next Inferior Court held for the said County, and no longer; which license, upon petition, may be renewed from year to year, if the Court think proper: *Provided, always*, that before issuing such license, the Court shall cause the petitioner to enter into bond, with sufficient security, to be approved by the Court, in the sum of fifty pounds, conditioned for

their keeping an *orderly and decent* house, with good and suffi-
cient accommodation for travellers, their horses and attendants,
which bond shall be filed in the Clerk's office, and subject to be
·put in suit upon any breach thereof."

The second section of the Act declares, that "the Justices of
every Inferior County Court, at the first term in every year, shall
fix and establish the rates and prices to be paid at taverns, for
liquors, diet, lodging, provender, stabling and pasturage; and
every tavern keeper shall, within one month after the rates so es-
tablished, obtain of the Clerk of the said Court, a fair table of
such rates, which shall be openly set up in the public entertain-
ing room, in every tavern, and there kept throughout the year,
until the rate shall be fixed or altered again by the Court, and
then a copy thereof shall be again so obtained, and kept, from
time to time, under a *penalty of ten pounds*, on every tavern-keep-
er failing so to do; and if any tavern-keeper shall demand and
receive any greater price for any liquor, diet, lodging, provender,
stabling or pasturage, than by such rate shall be allowed, he, she
or they so offending, shall forfeit and pay the sum of two pounds
over and above the sum extorted for every such offence, to the in-
former, recoverable with costs, before any Justice of the Peace
in the County where such tavern shall be." *Prince*, 839.

By this Act, it will be perceived that *any person* wishing to
keep a tavern or *house of entertainment* in this State, is required to
petition the Inferior Court and obtain a *license* to do so; give
bond and security to keep an *orderly* and *decent* house; obtain
from the Court the *established tavern rates*, and keep a fair table
thereof, openly set up, in the public *entertaining* room, &c. under
a *penalty* of ten pounds. In short, if any person wishes to keep
a tavern or house of entertainment for fee or reward, he must
comply with the provisions of the Act of 1791, or be subject to
the *penalties* prescribed by that Act. Something was said about
this Act not being of force in this State. I not only find it on the
Statute Book *unrepealed*, but find it in all the digests of the laws,
published by the authority of the Legislature, down to as late a
period as 1846. In *Cobb's Analysis* I not only find the Statute,
but a form of the petition, license, bond, &c. published by the
*direction* of the Legislature. *Cobb's Analysis*, 624.

The Statute, in my judgment, is a wise one, and intended to
protect the public generally from imposition and oppression, and

ought to be enforced as rigidly as any other law enacted by the Legislature.   The Courts have no power or authority to *dispense* with its provisions.   But it is contended, that the plaintiff does not claim *special* damage for an injury done to his *business*, as the keeper of a hotel or house of entertainment, within the meaning of the Statute.   The record in this case, in my judgment, affords ample evidence that the plaintiff is seeking to recover *special* damages from the defendant for an injury done to his *business*, as the keeper of a house of entertainment, so as to bring him within the provisions of the Act of 1791, without the necessity of my resorting to the eloquent language of one of my brethren, in *Ezekiel vs. Dixon*, (3 *Kelly*, 155, '6,) to prove that Statutes ought to be construed according to the strict *letter* thereof.   Two cases were cited on the argument from *Modern Reports*, to show that a man might live at a watering place, and furnish board and lodging, without being considered an inn-keeper, within the purview of the English Statutes on that subject.   Now, I do not hold that because a man lives at a *watering place*, and furnishes board and lodging to those who visit the place *for the benefit of the waters*, that he is *necessarily* to be considered either a tavern-keeper, or the keeper of a house of entertainment; but I do hold, that when a party *represents* himself to be engaged in the *business* of keeping a house of entertainment, and claims *damages* for an injury done to his business in *that character*, and the whole record shows he was acting in *that capacity*, he may as well keep such house of entertainment at a *watering place* as at any other place; and that the same reasons apply why the keeper of a house of entertainment, at a *watering place*, should comply with the provisions of the Statute, as if the house was kept at any other place.   Taverns and houses of entertainment, kept at watering places, are not *excepted* from the operation of the Act of 1791.

Who is to be considered a tavern-keeper, or keeper of a house of entertainment, by the Common Law?   *Blackstone* says, "If an inn-keeper or other *victualler*, hangs out a sign and opens his house for travellers, it is an implied engagement to entertain all persons who travel that way; and upon this *universal assumption* an action on the case will lie against him for damages, if he, without good reason, refuses to admit a traveller."   3 *Bl. Com.* 164.

The argument is much stronger when the party *expressly alleges* he is engaged in the *business of entertaining people* in a large

hotel, fitted up *for that purpose.* Mr. *Christian,* in a note in the 1st vol. of Blackstone, states, that " Tavern, hotel and coffee-house keepers are deemed inn-keepers. 1 *Bl. Com.* 430. In *Thompson vs. Lacy,* (5 *Eng. Com. Law Rep.* 286,) the defendant kept a house of public entertainment, called the Globe Tavern and Coffee-House, where he provided lodging and entertainment for travellers and others. No stage coaches or wagons stopped there, nor were there any *stables* belonging to the house. The question was, whether the defendant was an inn-keeper, according to the law of England. *Abbot,* Chief Justice, said, " The defendant in this case keeps a house where he furnishes *beds* and *provisions* to persons in certain stations in life, who may think fit to apply for them. I do not know that an inn-keeper can do more; for he does not absolutely engage to receive every person who comes to his house, but *only* such as are capable of paying a *compensation* suitable to the accommodation provided. Now, it appears to me, that the defendant cannot be distinguished from a person who keeps an inn in the country, in the way of travellers."

*Bayley,* J.—" I am of the opinion, this is *substantially* an inn. In order to learn its character, we must look to *the use* to which it is applied, and not merely to *the name* by which it is designated."

*Best,* J.—" An inn is a house, the owner of which holds out that he will receive all travellers and *sojourners* who are willing *to pay a price* adequate to the sort of accommodation provided, and who come in a situation in which they are fit to be received." The evidence offered and adduced on the trial, showed *the use* to which the plaintiff's hotel was applied. A " hotel" is defined by Webster, in his dictionary, to be " An inn ; a house for entertaining strangers or travellers." The same author defines a " tavern" to be " A house licensed to sell liquors in small quantities, to be drank on the spot. In some of the United States, *tavern* is synonymous with *inn* or *hotel,* and denotes a house for the entertainment of travellers, as well as for the sale of liquors." One of the definitions given to the word " entertainment," by the same author, is " the receiving and accommodating guests, either with or without reward." I now propose to make such extracts from the record only, as relate to the claim of the plaintiff for *special* damages done to his *business* as the keeper of a tavern or house of entertainment. I shall confine myself to the plaintiff's declaration, the evidence received on the trial, and to the evidence offer-

ed and rejected by the Court, as to the *special* damages claimed by the plaintiff, for an injury done to his *business;* for the reason that the Court admitted the evidence as to the *general* damage done to the *property* of the plaintiff, and to his *health,* by the erection of the nuisance by the defendant. The Court below rejected the evidence offered by the plaintiff to show *special* damages sustained by him, as the keeper of a house of *entertainment* at the Warm Springs. To escape from the provisions of the Statute, the plaintiff is driven to deny that he claims *special* damage done to his business, as the keeper of a house of entertainment. Before we proceed to examine the *character* in which the plaintiff claims damages for the injury sustained, it is important that the distinction between *general* and *special* damages should be observed. *General* damages are such as the law *implies* to have accrued from the wrong complained of. *Special* damages are such as *really* took place, and are not implied by law. 1 *Chit. Plead.* 385.

In the first count in his declaration, (and I am now speaking from the original record which is before me, and not the abstract of it furnished by the Reporter,) the plaintiff alleges his possession of the premises, called the Warm Springs; that there is attached thereto extensive and commodious baths, together with a *large hotel,* and a number of smaller buildings, all of which have been erected and fitted up at great expense, for the accommodation of the crowds of visitors who, for the last ten years, resorted there, &c.

In the first amended count of his declaration, the plaintiff alleges, that " he carried on and exercised, at the time aforesaid, and had done so for a long time previous thereto, and still continues to do so, the *business of entertaining,* boarding and lodging visitors, which said business was, at the time of committing said grievances by defendant, very profitable, to wit: of the yearly value of ten thousand dollars; yet the said defendant, knowing the premises, but contriving to injure your petitioner, and to deprive him of the benefit of the profits of his said business, erected a mill-dam, &c. so that from the first day of June, eighteen hundred and forty-six, to the first day of November, of the same year, your petitioner could not, and did not, carry on his *said business,* nor follow the same as he was used to do and would have done, but for the erection of said mill-dam; and your petitioner has

been deprived and prevented thereby, from receiving and *entertaining* a large number of visitors who were annually accustomed to resort to said springs, to wit: Alpha K. Ayer, (and two hundred and thirty-four other individuals, whose names are specially set out,) and thereby was deprived of obtaining from said visitors and *other persons*, thus prevented and deterred from visiting said springs, large sums of money by way of *profits*, to wit: the sum of three hundred dollars from each of the aforesaid persons, amounting in the whole to the sum of seventy thousand dollars." The second, third and fourth amended counts, all contain, substantially, the same allegations as the first. The substance of the plaintiff's charge is, that there had been erected a large hotel at the Warm Springs, and fitted up for the accommodation of visitors ; that he exercised and carried on the business of *entertaining*, boarding and lodging said visitors at said hotel, for great profit, to wit : of the yearly value of ten thousand dollars; that he has been prevented from *entertaining*, boarding and lodging said visitors, as well as others, by the erection of the mill-dam by the defendant. In short, the complaint is, that the defendant has, by the *erection* of the mill-dam, prevented the plaintiff from entertaining, at his *house of entertainment* at the Warm Springs, two hundred and thirty-four persons, specially named, besides *others,* to his damage in his business of keeping a house of entertainment, seventy thousand dollars.

To prove this injury to his business, as the keeper of a house of entertainment, the bill of exceptions states, that "the plaintiff offered the following testimony of William Coolidge, to show the *gross receipts* of the '*public house*' and appendages at the Warm Springs, by his accounts as book keeper," which was rejected. Several of the witnesses who were sworn, speak of the "hotel" at the springs, as well as those whose testimony was taken by interrogatories, and rejected. Tunis A. Prall, sworn for the plaintiff, says, " The *hotel* and outhouses were kept in good order, and that he was in the employ of the plaintiff as ' *bar-keeper*,' in 1846, at the springs." Daniel McDougald states that " the hotel" and outhouses were kept in good order in 1846. Charles Cleghorn says, "the hotel" and outhouses were in good order. Gen. Bailey says, " that in the year 1846, he was at the springs, and kept house himself, and only boarded his *horses,* and procured a portion of his supplies from ' *the tavern.*' and that his bill was some-

thing less than $200." Richard Bissell states, " the '*hotel*' and outhouses were kept in excellent order." E. J. Harden says, " he kept house at the springs, and did not spend much money at the hotel." James Hamilton says, " he does not know in what order the hotel was kept, as he was absent part of the summer." H. H. Mapp states, that the mill-pond was between one-fourth and one-half of a mile from the " Warm Springs Hotel," and that the *receipts* of the " Warm Springs Hotel," for the year 1847, were between twenty and twenty-five hundred dollars, and that the plaintiff was the proprietor thereof. Bishop Clements says, " What he means by the Warm Springs, is the spring of warm water, the baths, ' *public house hotel*,' store," &c.

But it is said that a " hotel " in France, means a gentleman's private residence. I have never been in France, and certainly shall not now go *there*, to ascertain the meaning of the word " hotel," when used in a Georgia Court. A " hotel" in this country, is as well understood to be a tavern, or house of *public entertainment*, as a church or meeting house is understood to be a place of *public worship*. When I take into view the *special* allegations in the plaintiff's declaration as to the injury done to his *business* in being prevented from *entertaining* the persons specially named therein, as well as *others* not named, and the testimony adduced on the trial, as well as that which was offered, as the same appears in the record before me, I do not doubt but that it is the object of the plaintiff to recover *special* damages from the defendant, for an injury done to his *business* as the keeper of a tavern or house of entertainment at the Warm Springs, as contemplated by the Act of 1791. The testimony offered and rejected, was to prove the *receipts* during different years, of what the witnesses called " the hotel," "the tavern," "the public house," " the public house hotel," " the Warm Springs hotel," of the plaintiff; and one of the witnesses says he was his " *bar-keeper*" in 1846. The plaintiff, according to this record, is suing for *special* damages done to his business as the keeper of a tavern or house of entertainment, in *addition* to the general injury which he alleges his *health* and his *property* have sustained by the act of the defendant. An allegation of the *character* in which the plaintiff sues, or of his *title to damages*, is generally descriptive in its nature and requires proof. 1 *Greenlf. Ev.* 70, §58. *Moises vs.*

*Thornton,* 8 *Term Rep.* 303. *Todd vs. Hastings,* 2 *Saunders' Rep.* 307, *note* 1.

According to the Statute of 1791, the keeper of a tavern or house of entertainment, is required to do certain things. He is required to obtain license, and to obtain and keep a fair table of his rates, in his *public entertaining* room. This Court is bound to presume the Inferior Court of Merriwether County has done its duty under the law, and *fixed the rate of charges.* The plaintiff, it is admitted, has not complied with the Statute in this particular, as the keeper of a tavern or house of entertainment, and is, therefore, liable to the *penalty* prescribed by it. The Act of 1791 was intended for the protection of the public. In *Bartlett vs. Vinor, Holt,* Ch. J. says, "Every contract made for or about any matter or thing which is prohibited and made unlawful by any Statute, is a void contract, although the Statute itself doth not mention it shall be so, but only inflicts a *penalty* on the offender, because a *penalty* implies a *prohibition.*" *Carthew,* 252. In *Cope vs. Rowlands,* it was held, a broker could not maintain an action for work and labor, and commissions for buying and selling stock, &c. unless duly *licensed* by the Mayor and Aldermen of the City of London, pursuant to 6 *Anne, ch.* 16. 2 *Meeson & Welsby's Rep.* 149. *Bensly vs. Bignold,* 7 *Eng. Com. Law Rep.* 121. *Gallini vs. Laborie,* 5 *Term Rep.* 242.

If all the *customers* which the plaintiff alleges he was prevented from *entertaining* at his house, by the act of the defendant, had come there to be entertained, he could not have collected their bills by law, for the reason he was acting in violation of the law ; and consequently the defendant has not injured him by depriving him of that which the law would not give him.

The testimony offered was inadmissible, in my judgment, upon another ground. The plaintiff offered to prove what had been the *receipts* of his "public house," by the book-keeper in 1845, and the receipts thereof for the year 1846, and then to show he had been damaged in his business as a keeper of such "public house," the *difference* between the *receipts* of the two years, in consequence of the defendant's mill-dam having kept away from his "public house" the two hundred and thirty-four customers which he specially alleges did not visit his "public house," to be entertained by him, on that account.

This evidence ought to have been rejected, on the ground it

Bonner *vs.* Welborn.

was too remote and uncertain to establish and fix the damages of the plaintiff against the defendant. The customers of the plaintiff might, or might not, have been kept away by the mill-dam. The great variety of circumstances, physical, moral, social and *pecuniary*, which influence and control the actions of men, might have operated to keep them away from the plaintiff's house of entertainment, had no mill-dam been erected by the defendant. Nor is it by any means certain, if they had all come to his house to be entertained by him, that they would all have *paid him* for such entertainment.. The true rule is stated by Professor *Greenleaf:* "The damage to be recovered must always be the *natural and proximate consequence* of the act complained of." 2 *Greenlf. Evid.* 210, §256. Witnesses state their *opinions* that customers were kept away by the mill-dam; but how can they *know* that such customers would certainly have visited the plaintiff's "public house," if the mill-dam had not been erected, or that they would have paid their tavern bills when they did come ? The object of the testimony was to show a *diminution of the profits* of the plaintiff's house of entertainment, by showing the absence of customers, residing in different parts of the country, whom interest, business, health or pleasure might induce to visit the "Warm Springs Hotel," or "*the tavern*," as one of the witnesses calls it. To allow such evidence to be received, as furnishing a *certain* and *safe* criterion for damages is, in my judgment, altogether too *speculative* and *visionary*, and would open a door for the indulgence of a system of *legal plunder*, under the *forms* of law, which ought not to be sanctioned.

In *Moore vs. Adam*, (18 *Com. Law Rep.* 305,) it was held, the plaintiff could not give in evidence, in an action for an assault, that in consequence thereof he had been driven from Allicant, in Spain, where he carried on the *business* of a merchant, and was thereby injured in his said *business* and compelled to leave it. The rule stated by the Court in that case with regard to special damages was, that you may give in evidence any special damage which is the *clear* and *immediate result* of the act complained of; but you cannot give in evidence, as special damage, any *remote* consequences, and that the damage which the plaintiff claimed for having been compelled to leave his business as a merchant at Allicant, in consequence of the assault of the defendant, was, *by far*,

*too remote.*  See *Crain vs. Petrie*, 6 *Hill's N. Y. Rep.* 522, to the same point.

I will now proceed to consider the charge of the Court to the Jury.  The Court charged the Jury, that the mill-dam, as shown by the proof, having been erected before the plaintiff purchased or went into the possession of the property, he could not maintain his action against the defendant for its *erection* or *continuance*, until he had *requested* the defendant to take it down.  The record shows that the mill-dam was *erected* by the defendant on his *own land*, in 1843, while S. R. Bonner was the owner and proprietor of the property alleged to have been injured; that in 1845, the present plaintiff, Robert Bonner, became the owner and proprietor of the property from S. R. Bonner.  The plaintiff's action was instituted on the 2d day of February, 1847.  The defendant erected the mill-dam on his own land, as he had the *lawful* right to do, so that he injured *no one else.*  From the time of its erection in 1843, up to the time of the purchase of the Warm Springs property by the plaintiff, no one was injured by this act of the defendant, so far as the record informs us.  Up to that time the defendant was in the *lawful* enjoyment of his mill-dam, for all *legal* purposes.  For aught that appears, the mill-dam may have been erected by the *approbation* and *consent* of S. R. Bonner, who was the owner of the Warm Springs property at *the time* of its erection.  When the mill-dam was erected by the defendant, on his own land, and continued there until the plaintiff became the purchaser of the Warm Springs property from S. R. Bonner in 1845, he had done no *wrong* to any body; certainly he had done no wrong to *the plaintiff*, as regards the Warm Springs property, by the *erection* of the mill-dam in 1843, when he was *not the owner of the property.*  All the *injury* which could result to that property, either directly or consequentially, by the act of the defendant in the *erection* of his mill-dam, must have necessarily affected the rights of *him* to whom the property belonged at the time *the act was done.*  S. R. Bonner was the owner of the property *at the time* the mill-dam was erected by the defendant, and had he continued the owner of the property, and the consequence of such erection of the dam of the defendant was a nuisance and injury to *his property*, such nuisance would have relation back to the time *the act* was done by the defendant as against *his* rights of property.  The act of the defendant from which the consequen-

tial injury resulted, was done while he was the owner of the property, and in legal contemplation, the act itself from which such injurious consequences resulted, would have been a violation of *his* rights, and an action could have been maintained by S. R. Bonner against the defendant, without any *request*, for the reason that *the act* of the defendant, in erecting the mill-dam, was done while he was *the owner of the property*. In other words, the consequential damage done to *his* property, resulting from *the act* of the defendant, while he was the owner of it, would have relation back to the time when the act was done, and as to *him* who was the owner of the property *at the time* of the *erection* of the mill-dam, the defendant would have been a *wrong doer*, and no request necessary. But what *act* has the defendant done, as against the present plaintiff's rights to the Warm Springs property? He has erected no mill-dam *since* he became the owner of the property, which could either directly or consequentially injure *his* property. The *act* of the defendant in erecting the mill-dam, from which the consequential damage is said to result, was not done as against *his* rights of property, but the rights of another. As to the present plaintiff, the consequential damage arising from the nuisance cannot relate back to the time of the erection of the dam, for that act of the defendant did him nor his property *no injury*, at the time of its erection. But it is said the defendant became a *wrong doer* as against the rights of the plaintiff, by *continuing* the nuisance. At what *time* did he become such wrong doer? Certainly not from the time of the *erection* of the mill-dam in 1843, for then the plaintiff had *no interest* in the property to be injured by *that act* of the defendant. What act of the defendant, I repeat, constituted him a *wrong doer* as against the present plaintiff?

The erection of the dam on his own land was a *lawful* act, at the time it was done, and if the consequences resulting from it proved *injurious* to the owner of the property in question, so as to make the act *unlawful*, the plaintiff was *not such owner*. When, in the eye of the law, could the defendant be considered as a *wrong doer*, as against the rights of the plaintiff, with regard to the Warm Springs property? From the time he became the *owner* of the property, and *notified* him that his mill-dam was *injurious* to such property, and *requested* him to remove it. From the *time of such request*, the defendant would be considered in law, as the

*continuer* of a nuisance, as against the rights of *the plaintiff*, and a *wrong doer*, as against *him*, and not before.   The *wrong* of the defendant would then consist in his *refusal* to abate the nuisance, after *notice* of its injury to the *health* or *property* of the plaintiff, and a *request* to remove it.   The majority of the Court concede, as I understand them, that if the defendant had transferred the property, on which the mill-dam was erected, to A B, that before the plaintiff could have maintained his action against A B, a *request* would have been necessary, on the ground that A B would be an innocent purchaser of the property, and have no knowledge that the mill-dam was *injurious* to any body.   The argument applies with equal force to the present defendant, as against *the plaintiff*.   He had the unquestioned right to erect the mill-dam on his own land, and did erect it, without injury to the then owners of the Warm Springs property, or any body else, so far as the record informs us.   The dam was erected in 1843, and so far as the record shows, injured *no one* until 1846, and of the fact that it did injure any body, the defendant was wholly ignorant, until the commencement of the present suit, so far as the record shows. As against the *present plaintiff*, the defendant stands precisely on the same footing, with regard to the *reason* and *justice* of a *request* being made, as A B would stand, if he had purchased the property of the defendant.   I cannot perceive any rational distinction between the two cases, upon principle.   As against S. R. Bonner, the former owner, A B, the purchaser from the defendant, would not have *erected* the nuisance, but only *continued* it, as against his rights, and therefore it is said a *request* is necessary.   Precisely so with the defendant.   He did not *erect* the nuisance, as against the rights of the *present plaintiff;* he has only *continued* it, as against *him*, since he became the purchaser of the property, and therefore, a *request* is equally necessary.   The defendant is not presumed to know that the *continuance* of the mill-dam would have injured the *present plaintiff*, as the owner of the property, inasmuch as it did not injure the *former proprietor*, any more than A B, the purchaser from the defendant, would be presumed to know, that the mill-dam on the premises purchased by him, would have injured S. R. Bonner, had he continued the owner of the property.   The truth is, that neither the defendant, nor A B, the purchaser from him, can be charged as *wrong doers*, for *erecting* the nuisance, as against the plaintiff.   In either case, the parties merely *continue* the nui-

sance, and neither are wrong doers, until *notice* and *request* to remove it. This is the *reason* of the rule, and as applicable, when the suit is instituted by the *feoffee*, after the erection of the nuisance, against him who erected it, as it is when the suit is brought by the owner of the property at the *time* of the *erection* of the nuisance, against the *assignee* of the party who did erect it.

But it is said that *Penruddock's* case, in 5 *Coke*, 101, settles this question in favor of the plaintiff in error. As I read that case, it is an authority to sustain the judgment of the Court below. There is an *obiter* remark of the Court, upon which the counsel for the plaintiff in error seem to rely. That was an action of *quod permittat prosternere*, alleging that one Cock erected upon his freehold a house, so near the curtilage of a house of Thomas Chichley, that it did overhang the curtilage of the plaintiff, whereby the rain fell upon it, &c. Thomas Chichley was *the owner* of the house, *at the time* the nuisance was *erected* by Cock. Cock had transferred the property on which the nuisance was erected by him, to Penruddock, and Mary his wife. Thomas Chichley, whose property was injured by the nuisance created by Cock, had transferred it to Clark, who brought the action against Penruddock, and Mary his wife. The suit was therefore brought by Clark, who was the feoffee of Thomas Chichley, against Ed. Penruddock, and Mary his wife, assignees of John Cock. This case, it will be perceived, involved two questions :

First, Whether the action could be maintained by Clark, the feoffee of Thomas Chichley, whose property had been injured by *the act* of Cock, *before* Chichley had transferred it to Clark, *without request.*

Second. Whether the action would lie against Penruddock and wife, who were the *assignees* of Cock, who *erected* the nuisance, *without request.*

The two questions are distinctly made by *the facts* of the case, and *no other*. It was resolved by the Court, " that the distilling of the waters, *in the time of the feoffee* or *assignee*, is a *new wrong ;* and this writ lieth *after request* of amendment, but *not before ;* but it lieth against him who did the wrong, without request, and the action good." The distilling of the waters, by Penruddock and wife, upon the house of Clark, after he became the owner or feoffee of it, was a *new wrong*, and the action lay in favor of Clark, the feoffee of Chichley, for such *new wrong*, after *request* by Clark,

the feoffee, of an amendment by Penruddock and wife, but *not before*. The *act* of erecting the nuisance by Cock, as against Chichley, the owner of the house, was no *wrong* done to Clark, who purchased the house *after* the nuisance was erected, but it was the *continuing* the nuisance, in *the time of Clark*, that made the defendants *wrong doers*, after *request* of amendment by Clark, the feoffee of Chichley. Now, let us apply the principle settled in Penruddock's case, to the one before me. Robert Bonner, the plaintiff, is the feoffee of S. R. Bonner, who was the *owner* of the Warm Springs property, at *the time* the nuisance was *erected* by the defendant in 1843. In 1845, Robert Bonner, the feoffee of S. R. Bonner, became the owner of the property; and the *continuing* the nuisance by Welborn, the defendant, *in the time* of Robert Bonner, the feoffee, after *request* to remove it, would have been a *new wrong*, for which an action would lie after such request, but not before.

The action, as I have already said, would have lain against the defendant, in favor of S. R. Bonner, without request, according to the *obiter* remark of the Court, in Penruddock's case; for the wrong was done by the defendant in *erecting* the nuisance, to *his* rights, and as against *him* and *his* rights, the defendant was the one who *did the wrong*, by *erecting* the mill-dam; and that is my understanding of Penruddock's case.

But if I am mistaken as to the questions decided by the Court in Penruddock's case, I have the satisfaction to know that I shall be found in at least *respectable* company. Mr. *Selwyn*, in treating upon this subject, says : "If the house, &c. affected by the nuisance, be *aliened*, the *alienee, after request* made to remove the nuisance, may maintain an action for the nuisance;" and cites Penruddock's case as his authority. 2 *Wheaton's Selwyn*, 856. *Professor Greenleaf*, speaking of nuisance, remarks : "So, if *the plaintiff* has *purchased a house*, against which a nuisance *has been committed*, he may maintain this action for the *continuance* of the nuisance, after *request* to abate it;" and cites Penruddock's case as his authority. 2 *Greenl. Ev.* 385, §472.

Mr. *Starkie*, speaking on the subject of nuisance to lands, thus states the rule : "Where a house, in *respect of* which a nuisance has been committed, has been aliened, the alienee may maintain an action for the continuance of the nuisance, after request made

to abate or remove the nuisance ;" and cites Penruddock's case as his authority. 3 *Starkie's Ev.* 992.

Mr. *Chitty* says : " A *request* to remove is *always* essential, before *an action* can be commenced against a mere *continuer* of a nuisance ;" and cites Penruddock's case. 1 *Chitty's General Prac.* 569. The defendant here, as against Robert Bonner, was a mere *continuer* of the nuisance ; he *erected* no nuisance in *his time,* either by mill-dam or otherwise. *Loftin vs. McLemore,* 1 *Stewart's R.* 133, was an action on the case, for *erecting* and *continuing* a mill-dam, alleged to be a nuisance. The plaintiff became the proprietor of the land injured thereby, after the erection of the nuisance, and alleged and proved a request to the defendant to remove it. On the trial, the Circuit Court held, that if the nuisance was erected before the plaintiff became the proprietor of the land injured, a continuance of it was not such an injury to the plaintiff as would sustain an action : whereupon, exceptions were taken to the decision of the Circuit Court, and the case came before the Supreme Court of Alabama. The Supreme Court held, that " the alienee of land, sold subsequent to the erection of a nuisance, may maintain an action for *continuing* it, after a *special request* to remove it. The *continuance* is a *new ground* of action, without resorting to the period of time when it was *first erected.*"

This case, it is true, does not *expressly decide,* that an action by the alienee of land, sold subsequent to the erection of the nuisance, could not be maintained against the party erecting it, *without request ;* for in that case, a *special request* was alleged and proved, but the case does show, that the defendant who erected the nuisance, as against the alienee, who purchased the land subsequent to its erection, is merely a *continuer* of the nuisance, as against the rights of such alienee, from the *time of the request* to remove it ; for the *continuance,* (says the Court,) is a *new ground* of action, without resorting to the period of *time,* when it was *first erected.* In the view of the Court in that case, the defendant, as against the rights of the *alienee* or *feoffee* of the property, *subsequent* to the erection of the nuisance, becomes a *wrong doer,* only from the *time of the request* to remove it. That case also shows, that it was the understanding of the profession, that when the action was brought by the *alienee* of the property, *subsequent* to the erection of the nuisance, that a *request* to remove it was *necessary.*

The plaintiff here alleges the mill-dam was *erected* by the defendant, in 1843, to injure *him* and *his* property, when the proof shows that he was not the owner of the property, until 1845. It may be said this act of the defendant, in erecting this mill-dam in 1843, did not operate as a *nuisance*, until the present plaintiff became the owner of the property. In that view of the question, the reason why he should have *notified* him and *requested* the removal of the dam, applies with increased force; for if that be true, the defendant was not a *wrong doer* by the *erection* of his mill-dam, against the plaintiff or any body else; and all the averments in his declaration, that the *erection* of the dam by the defendant, in 1843, was done to injure *him* and *his* property, falls to the ground, and is wholly *unsupported* by the evidence. The plaintiff is necessarily then, driven to rely on such parts of his declaration, wherein he alleges the defendant *continued* the nuisance, after it became one, as against *him* and *his* property. From what time did the defendant become the *continuer* of the nuisance, as against the plaintiff? From the time he *notified* him the mill-dam which he had erected in 1843, on his own land, was injuring *him* and *his* property, and *requested* him to remove it. There being no such *request* alleged or proved, the defendant is not liable to the present plaintiff, as a *wrong doer*, for the *continuance* of the nuisance, caused by the erection of the mill-dam in 1843, before the plaintiff became the owner of the property alleged to have been injured.

If the defendant, who *erected* the mill-dam in 1843, is to be considered a *wrong doer*, as the *continuer* of the nuisance against the plaintiff, who became the owner of the property in 1845, it is to be hoped that the majority of the Court will, by their judgment, establish definitely, *the time* at which the defendant became such *wrong doer*, as the *continuer* of such nuisance, as against the present plaintiff—if the defendant did not become a *wrong doer*, as the *continuer* of the nuisance, from *the time* of *notice* and *request* to remove it, as against the present plaintiff. My conclusion then is, that the Act of 1791 is of force in this State; and that the evidence furnished by the record before me, clearly shows that the plaintiff claims *special* damage from the defendant, for an *injury* done to his *business*, as the keeper of a tavern or house of entertainment at the Warm Springs, within the words and meaning of that Act; and that to enable him to recover such damages, in

Bonner *vs.* Welborn.

*that character,* he ought to have shown at the trial, he had complied with the requisitions of that Statute.

That the evidence offered to show the *special* damage which the plaintiff had sustained, as the keeper of such tavern or house of entertainment, in consequence of the absence of a great number of persons who had usually been his customers, was *too remote, speculative* and *visionary,* to furnish a *safe* and *certain* criterion for damages, inasmuch as the absence of such customers was not necessarily the *natural* and *proximate consequence* of the injury complained of.

That inasmuch as the record shows that the mill-dam was *erected* by the defendant, in 1843, while S. R. Bonner was the owner of the property in question, and that his alienee, Robert Bonner, the present plaintiff, did not become the owner of the property until 1845, the erection of the mill-dam in 1843, by the defendant, was no injury to the rights of the present plaintiff; that the defendant is not liable to the present plaintiff, as the *erector* of the mill-dam in 1843, the plaintiff having become the purchaser of the Warm Springs' property *since* the erection of the alleged nuisance by the defendant; that if the *injury* which the plaintiff has sustained to his property, is in consequence of the *continuation* of the mill-dam by the defendant, since the plaintiff became the *alienee* of the property, then no action lies against the defendant, at the instance of the plaintiff, for such *continuation,* until *notice* of the injury and *request* to remove the nuisance ; the defendant not being considered in law as a *continuer* of a nuisance and a *wrong doer,* as against the plaintiff's rights, until such *request* to remove it, and neglect or refusal to do so by the defendant.   For these reasons I am of the opinion the judgment of the Court below should be affirmed.