## ROBERTS *et al. v.* GEORGIA RAILWAY & POWER CO.

A grantee or alienee of property causing a nuisance is not liable for damages caused by its continued maintenance and accruing prior to a notice or request to abate.

No. 1885. MARCH 4, 1921.

Certiorari; from Court of Appeals. 24 *Ga. App.* 664.

Vickery's Creek, known also as "Big Creek," is a tributary to the Chattahoochee River, and approaches the river at the town of Roswell from the north side. The Laurel Mills Manufacturing Company owned several tracts of land forming one body at and near the confluence of the two streams. This body of land bordered the river above and below the mouth of the creek and included the bed of the latter stream. On this land was a water-power supplied by waters from the creek. In 1862 the Laurel Mills Manufacturing Company developed the water-power and erected and equipped a factory near the juncture of the two streams. As a part of the manufacturing plant there were certain buildings located along the river front and on both sides of the creek. The natural fall in the bed of the river was sufficient to carry the water off without overflow or injury to the buildings, machinery, or other prop-

erty of the manufacturing plant or interference with its operation. In 1902 the Atlanta Water and Electric Power Company, a chartered public-service corporation, constructed a dam across the river at Bull Sluice, about three miles below the mouth of Vickery's Creek, which was of such height and character as to elevate or cause back water in the river at and above the Laurel Mills property. Subsequently the Atlanta Water and Electric Power Company sold its property to the Georgia Railway and Power Company, another public-service corporation, and executed a deed, dated March 8, 1912. The Georgia Railway and Power Company took possession under that deed, and continuously maintained the Bull Sluice dam in carrying on the work for which it was incorporated. On August 5, 1911, I. M. Roberts, G. W. Wing, and J. P. Brooke became purchasers of the Laurel Mills property and received a deed therefor from the trustee in bankruptcy of the Laurel Mills Company. Subsequently G. W. Wing sold his undivided interest in the property to his cotenants, and executed a deed to them, dated June 9, 1917. On June 26, 1917, I. M. Roberts and J. P. Brooke instituted an action for damages against the Georgia Railway and Power Company, on the basis of injury to their said property by a continuing nuisance. In stating the nuisance and its injurious effects, the petition alleged, among other things: " On or about the year 1902, there was constructed a dam across the said Chattahoochee River approximately fifty (50) feet high at a point known as Bull Sluice about three (3) miles below the properties above described, thereby creating a large reservoir which extends up to, alongside of, above, and beyond the properties of petitioners, and which is used by the defendant, in connection with its power-house and machinery, in generating electricity. . . That the erection of said dam and the creation of said reservoir, and the continued maintenance by the defendant of said dam and reservoir, has created a nuisance, and is a continuing nuisance, which has been a nuisance [since] the same was built and constructed, and which is now a nuisance, and has been maintained by the defendant since on or about March 6th, 1912, and is now being maintained by the defendant as a permanent and continuing nuisance to the injury and damage to the petitioners to the amount herein alleged. . . The defendant acquired title to said dam and reservoir on or about March 6th, 1912, since which time defendant has continued to maintain,

and is now maintaining, the same as a continuing nuisance as herein set out, and to the great injury and damage to the petitioners in the amounts specified herein. . . The erection of said dam and the construction of said reservoir, and the continued maintenance of the same by the defendant, has been and is a continuing nuisance, for the reason that it has caused and is causing the waters in said river to pond up and to deaden the flow and retard the velocity, and to back water up to, alongside of, above and beyond the properties of the petitioners, and into the tailway and up to and into the power-house and over the turbine wheels used in driving the machinery in petitioners' factory; causing large deposits of sand, dirt, logs, rafts, drifts, and brush and [to?] accumulate and be deposited in the bed of said stream, forming in places islands consisting of several acres. . . Said conditions have been gradually growing worse from year to year and from time to time, especially so since the acquisition of said property by the defendant, and are gradually continuing to grow worse all the time. . . Since the erection of said dam and reservoir and its maintenance by the defendant, the bed of said stream, which was formerly rock, clear of sand, is now covered with mud and sand to a depth of several feet in places below petitioners' properties and alongside of petitioners' properties, and the water in said stream has been elevated and raised several feet, which is shown along the banks of petitioners' properties and the tailway of petitioners' power-house, which said deposits of sand and mud and the elevation of said waters have checked and impeded the flow in said tailway and impaired the value and affected and injured petitioners' power-plant and the properties of petitioners as herein set out." Special damages attributable to the continuance of the nuisance, sustained by plaintiffs, were alleged to arise from reduction of power of plaintiff's water-power, rendering it inefficient and necessitating an abandonment of the operation of the factory; from flooding the factory and certain buildings along the river front in time of high water, causing injury to the factory machinery and the several buildings and depreciating their market value; from the creation of "foul odors and obnoxious stenches, causing miasma and malaria," thereby rendering certain houses uninhabitable and decreasing their market value; from enforced shutting down of the factory, causing certain houses occupied by employees of the factory to become

useless and of less market value. The petition alleged a right of
the plaintiffs to recover all such damages as flowed to them from
the causes stated above, within the four years preceding the insti- ·
tution of the suit.  It is also alleged that on the 8th day of June,
1917, petitioners gave written notice, as required in the Civil Code,
§ 4458, to the Georgia Railway and Power Company, as owner by
assignment of the Bull Sluice dam and reservoir, to abate the same
as a nuisance.  No demurrer was filed, but the defendant answered.
On the trial there was no evidence of damage on account of " foul
odors " and " obnoxious stenches," but there was evidence tending
to show title in the plaintiffs as alleged, and injury to their prop-
erty as described in the petition; but there was no evidence to show
any change in the dam after the defendant purchased the property,
or any special damage or injury to the property during the 18 days
intervening between the date of the notice and the date of the suit.
There was evidence as to certain flash-boards on top of the dam;
but the deed to defendant shows that this equipment was part of the
dam at the time of the purchase by it.  At the conclusion of the
plaintiff's evidence the judge granted a nonsuit.  The plaintiffs ex-
cepted.  The judgment of the trial court having been affirmed by
the Court of Appeals, the case is here for decision on certiorari.

*Richard B. Russell, Richard B. Russell Jr., Fred Morris,* and
*Campbell Wallace,* for plaintiffs.

*Colquitt & Conyers,* for defendant.

ATKINSON, J.  As shown by the allegations of the petition, the
action is based on continuance of a nuisance created by the de-
fendant's grantor in 1902.  There is no allegation that the de-
fendant made any change in the dam after its purchase.  The
evidence as to occasional use of certain flash-boards on top of the
dam did not show a change in the use of the dam, because the
deed to the defendant shows that the flash-boards constituted a part
of the dam at the time of its purchase.  Such being its character,
the case is not one for application of the ruling in *Middlebrooks* v.
*Mayne,* 96 *Ga.* 449 (23 S. E. 398), to the effect that a notice is
not " essential to the maintenance of an action against the alienee
for injuries occasioned by changes made by himself in the charac-
ter or structure of the nuisance."

The controlling question in this case is whether the grantee or
alienee of property causing a nuisance is liable for damages caused

by its continued maintenance and accruing prior to a notice or request to abate the same. The cause of action in the case of *Bonner* v. *Welborn, 7 Ga.* 296, may be summarily stated thus: In 1843, Alfred Welborn erected a mill-dam on his own land, adjoining the property known as the Meriwether Warm Springs, then the property of Seymour R. Bonner. In 1845, Seymour R. Bonner sold and conveyed this property to Robert Bonner. In 1847, Robert Bonner instituted an action for damages against Alfred Welborn, on the basis that the mill-pond formed by constructing the dam across the stream was a nuisance, and that its continuance during the year 1846 had rendered the vicinity unhealthy, which injuriously affected the plaintiff's hotel business at Meriwether Warm Springs and caused him pecuniary loss. A verdict for the defendant was returned. The plaintiff excepted, assigning error on certain rulings of the court on the admissibility of evidence, and upon an excerpt from the charge to the jury. The judgment was reversed, one of the Judges dissenting. Separate opinions were rendered by each of the three Judges. The defendant Welborn was not an assignee, but was the original builder of the dam and the owner of the same when the action was brought; and consequently the exact case now for decision was not involved. However, the controlling question involved was learnedly discussed by each of the Judges; and the 7th headnote of the opinion is as follows: "The alienee of the person who erected the nuisance is liable for the continuance of the nuisance, but only on request to abate it." After citing a number of English cases and enunciating certain pertinent principles Judge Nisbet in his opinion said: "The conclusion from these principles is irresistible, that he who does hurt or damage to another, in the use of his own property, is liable, without notice or request. There is but one exception to this rule, authority." Further he said: "As to the exception that request is sued. This exception, to my mind, is not altogether consistent with the principles upon which this kind of action is founded. The authorities, however, recognize it, as will appear, and I yield to authority." Further he said: "As to the exception that request is necessary where the action is against the alienee of him who first erected the nuisance, I have to say that it is sustained in the case of Penruddock, 5 Coke, 100; also in 2 Greenlf. Rep. 36. I do not question this rule on authority. The alienee is liable, because

he continues the nuisance, which is the same as a new wrong."
Judge Lumpkin concurred in the general views and reasons of
Judge Nisbet, and proceeded to deliver an elaborate opinion, in
the course of which he referred to the question of notice to abate.
After discussing a number of English cases, he said: " Up to this
period, we find nothing in the books of notice, as between any
parties.  But Penruddock's case (5 Coke, 101) established the doc-
trine that where suit is brought against the feoffee of the person
who erected the nuisance, that a previous request to abate it was
necessary; and from that time this distinction seems to have been
generally followed, both in England and in this country."  After
discussing other cases it was again said: " Thus, it is manifest,
that whenever and wherever the doctrine has been discussed, the
principle in Penruddock's case has been constantly cited, and al·
ways adhered to, without variableness or shadow of turning; *which
is, that in an action for a continuance of the nuisance, against the
feoffee of the wrong-doer, whether at the instance of the original
proprietor of the property injured or his assignee, request must first
be made; but that as against him that committed the wrong, the
original erector or promoter of the nuisance; no notice is necessary,
no matter who sues.*  [Italics ours.]  And, as was rightly said in
Winsmore *v.* Greenbank, ' The law is certainly so, and the reason
is obvious.'  And hence, we conclude, that the present action is
properly brought against Welborn, who erected the nuisance, and
who continued to keep it up, without notice."  It thus appears that
Judge Nisbet and Judge Lumpkin both were of the opinion that
the principle announced in Penruddock's case was the law.  The
reversal, under application of that principle, was on the ground
that Welborn was the original constructor of the ·nuisance and not
entitled to notice, under the principle of Penruddock's case.  Judge
Warner delivered an elaborate dissenting opinion, in the course of
which he dealt with the same question.  He also agreed that the
principle announced in Penruddock's case was the law, but, apply-
ing that principle, said in effect that inasmuch as Robert Bonner
did not own the Warm Springs property at the time Welborn con-
structed the dam, he was not injured by the original construction
of the nuisance, and that relatively to him — an alienee acquiring the
Warm Springs property in 1845, and suffering consequential dam-
age to his business in 1846, Welborn could only be held liable on

the basis of his being a continuor of the original nuisance, and that he would not be guilty of any wrong, as against Robert Bonner, until notice or request from him to abate. In the course of his discussion of this subject the Judge said: "When, in the eye of the law, could the defendant be considered as a wrong-doer, as against the rights of the plaintiff, with regard to the Warm Springs property? From the time he became the owner of the property, and notified him that his mill-dam was injurious to such property, and requested him to remove it."

It thus appears that the principle of Penruddock's case was recognized by the entire bench of three Judges, and that under application of that principle there was no disagreement as to the necessity of giving to an alienee notice to abate the nuisance, before such alienee would become responsible for injuries resulting from such nuisance. The only point of difference was as to the necessity of notice to abate, given to the creator of the nuisance where the person injuriously affected was himself an alienee and did not own the property injured at the time the nuisance was created. The opinions rendered by the Judges, sanctioning as authority the decision in Penruddock's case, pronounced a principle declaring the responsibility of an alienee for continuing a nuisance created by another. These opinions can not be read without reaching the conclusion that the Judges rendering them contemplated that such responsibility of an alienee would commence with the giving of notice to abate the nuisance. More than ten years after the rendition of that decision the first Civil Code of this State was adopted by the General Assembly, within which appeared the following section (Code of 1863, § 2943): "The alienee of a person owning the property injured may sue for a continuance of the nuisance; so the alienee of the property causing the nuisance is responsible for a continuance of the same. In the latter case there must be a request to abate, before action brought." This language has appeared in every subsequent Civil Code of the State, and is now § 4458 of the Code of 1910. This is a codification of the common law as interpreted in the decision of *Bonner* v. *Welborn,* supra; and it now has the force of statute law.

The great contention of the plaintiffs is, that the words, "before action brought," as employed in the code section, denote merely a remedial requirement that notice be given before institution of

a suit, rather than that such notice is a requirement before responsibility for continuance of the nuisance will attach to the alienee of the nuisance. In support of such contention counsel cite and discuss the case of Penruddock and decisions of courts and text-writers that preceded and followed it, including the several opinions of the Judges in *Bonner* v. *Welborn,* supra, and other decisions of this court. In *Central Railroad* v. *English, 73 Ga.* 366, it was held: "Where one railroad company erected a nuisance, and was subsequently leased to another company, which continued to maintain such nuisance, if the owner of the property on which it was situated notified the president and officers of the lessee company of it, and his tenant also notified the section-master of the company, this was sufficient notice and demand for abatement, and the tenant could bring an action for injuries resulting to him, without more. Notice of the nuisance is sufficient." This ruling that notice to the alienee of the existence of the nuisance is a sufficient compliance with the law is incompatible with the contention that the "request to abate," referred to in the code section, is a mere remedial requirement.

In *Southern Railway Co.* v. *Cook, 106 Ga.* 450, 453 (32 S. E. 585), it was said: "If, however, a person come into possession of property upon which there is an existing nuisance, before an action can be maintained against such person for continuing the nuisance it is essential that there should be a request to abate it, before any liability for maintaining the same would arise." Citing, *Bonner* v. *Welborn,* supra; *W. & A. R. Co.* v. *Cox, 93 Ga.* 561 (20 S. E. 68); *Middlebrooks* v. *Mayne,* supra. So in *Blackstock* v. *Southern Railway Co., 120 Ga.* 414, 416 (47 S. E. 902), it is said (immediately after quoting the code section): "If before an action can be brought against the alienee of the property causing the nuisance there must be a request to abate the nuisance, then it is evident that no cause of action arises against such alienee until such request is made. The cause of action against him is, continuing a nuisance after having been notified of its existence and requested to abate it." What is quoted from the last two cases was necessarily said in showing the difference in the two causes of action under discussion, and therefore was not obiter, as counsel contends. See also 20 R. C. L. 392, § 16, and cases cited under

note 8. The request to overrule *Southern Railway Co.* v. *Cook,* and *Blackstock* v. *Southern Railway Co.,* supra, is denied.

Giving to the code section the construction that the notice to abate, therein referred to, is not merely remedial, but is a provision that must precede responsibility of such alienee, the Court of Appeals did not err in affirming the judgment granting a nonsuit.

*Judgment affirmed. All the Justices concur.*